ST. PAUL, J.
 

 Plaintiff brings this suit against the Orleans levee board for alleged loss and damage to his property and business on both sides of the old public ■ road, now Patterson street, in the Fifth district of the city of New Orleans (Algiers). Ho complains, not only that the building of the levee, on lots owned by him and situated between the old public road aforesaid and the river, took and destroyed that realty to the value of $221,840, together with certain improvements thereon, to wit, a certain sawmill and machinery valued at $75,000, certain buildings valued at $17,000, and certain driveways and lumber foundations, valued at $2,500 (the value of which he now claims), but he also complains that, as the direct and immediate result of such taking, he has sustained additional losses as follows, to wit: Loss (depreciation) on certain other property owned by him, situated on the other side of Patterson street and used in connection with said sawmill, say $14,602.40; also the cost of removing certain lumber, say $5,000; also a loss on certain timber sawed up into standard instead of special sizes, say $5,000; and profits which he would have earned, had he not been disturbed, say $132,844.52. Of which the
 
 first four items
 
 above mentioned aggregate $316,240, and the
 
 last four items
 
 aggregate $157,446.92, making the total of plaintiff’s claim the sum of $473,786.92.
 

 The answer of the defendant asserts in substance that the locus in quo lies between the
 
 front street
 
 and the water edge, and is part of the
 
 batture and banh
 
 of the Mississippi river, and hence is subject to a servitude in favor of the public for levees, roads, commerce, and navigation; that plaintiff’s monopoly of the bank to the exclusion of the public was unlawful; that his enjoyment thereof heretofore was by sufferance only, which has now terminated; and that his structures should be abated as a public nuisance.
 

 The fact is that the new levee at this point was built on the riverside edge of Patterson street, and now stands some 13 feet above the level of said street, thus throwing the whole of the property mentioned in the
 
 first four items
 
 of plaintiff’s claim into the bed of the Mississippi river.
 

 The case was tried by jury, first called for by plaintiff' and then waived, and afterwards again called for by defendant. The jury visited the locus at the inception of the trial (and perhaps once more; but as to this the record is not clear, and it is immaterial), and, after hearing the case during a period extending from January 13, 1922, to February 7, 1922, unanimously returned a verdict in favor of plaintiff for the sum of $125,000, which verdict the trial judge approved, by refusing the neW trial prayed for by defendant. Whereupon defendant appealed, and plaintiff answered the appeal, praying for an increase.
 

 I.
 

 The action is brought under article 312 of the Constitution of 1898, reading as follows:
 

 Art. S12.
 
 Any person whose property has been appropriated within twelve months prior to the adoption of this Constitution, or
 
 whose proper
 
 
 *161
 

 ty may hereafter he appropriated
 
 by the Orleans levee board for levee purposes, shall have a right in action against said board in any court of competent jurisdiction for
 
 the value of said
 
 property, and whatever judgments may be finally rendered against the board shall be paid out of the taxes collected by it in the same manner as other disbursements are made:
 

 Provided, that this shall not apply
 

 (1) To batture property,
 

 (2) Nor to vacant property, where only a part thereof has been taken for levee purposes, and where the effect of the levee building would be to protect the remaining part of the same property;
 

 (3) Nor to any property on any part of the river front, the administration and control of which is vested, for the purposes of commerce, either in the state or city authorities, and on which improvements have been erected under grants from the city of New Orleans, or other authority,
 

 (4) Nor to the said improvements:
 

 Provided, that said board shall have power to appropriate property subject to such servitude, for levee building, as under existing laws,
 
 without making such compensation in advance.
 

 (Italics, arrangement, and matter in parenthesis ours.)
 

 II.
 

 This constitutional provision was (seemingly) a departure from the ancient laws of this state under which all
 
 rural
 
 riparian property owed a public servitude for levee purposes; so that as much of the land as might be needed for such purposes must be surrendered, without compensation for the protection of the rest (generally 40 arpents or more in depth) and of the public. Bass v. State, 34 La. Ann. 498; Cash v. Whitworth, 13 La. Ann. 401, 71 Am. Dec. 515; Dubose v. Levee Commissioners, 11 La. Ann. 165. On the other hand, to compensate for this burden (if a burden at all) the rural riparian proprietor enjoyed the right of “accretion” by which, if the river receded and the levees were pushed forward, he enjoyed the increase thus brought to his land (C. C. art. 510), and all lands in the ancient province were
 
 rural
 
 and riparian except that part thereof selected as the original site of the city of New Orleans, in front of which the founders of the city laid out and dedicated as a public quay, or landing, all the space between the front row of houses and the river; nor did the
 
 subsequent
 
 inclusion of the adjoining plantations within the limits of the incorporated city change the rights and obligations of the landowners. Municipality No. 2 v. Orleans Cotton Press, 18 La. 122, 36 Am. Dec. 624. See also Hennen’s Digest, vol. 2, p. 967, No. 13.
 

 But when those rural lands, thus incorporated into the city, had long been divided up into lots and sold, so that one man owned only a small lot in front, and the land behind him belonged to others, it began to appear that it was no longer a case of giving up a small part of one’s land and thereby getting protection for all the rest, but of one man being required to give up
 
 all
 
 his land, together with the improvements thereon, in order to protect the lands, not of himself, but of others.
 

 The fairness of this in the one case, and its unfairness in the other, appealed to the convention of 1898, and inspired the article above quoted. See exception No. 2.
 

 III.
 

 In order to understand just how far, and no farther, the convention meant to go in article 312, that article must be read in the light of two public events which appear of record in the contemporaneous legislation and jurisprudence of this state.
 

 First, we must consider the opening clause of article 312, reading as follows:
 

 “Any person whose property has been appropriated within twelve months prior to the adoption of this Constitution, * * * by the Orleans levee board for levee purposes, shall have a right in action against said board,” etc.
 

 ✓
 

 Next, we must look at the preamble to Act No. 79 of 1898, entitled “An act authorizing the board of commissioners of the Orleans levee district to indemnify the owners of certain property appropriated, damaged or de
 
 *163
 
 stroyed for levee purposes; to provide funds for that purpose; and to provide for suits against the Orleans levee hoard by. the owners of property,” which preamble reads in part as follows:
 

 “Whereas, it became necessary to construct now levees in the fifth municipal district of the city of New Orleans” (said fifth municipal district being on the right bank of the Mississippi river, opposite the city proper, and known by its ancient name of. Algiers, wherein the present controversy originated).
 

 And turning, then, to the case of Louisiana Construction Co. v. Illinois Central R. Co., 49 La. Ann. 527, 21 South. 891, 37 L. R. A. 661, we find that this court, by a bare majority, had just declared illegal certain grants made by the city of New Orleans to the Illinois Central Railroad Company, by virtue whereof said railroad company had erected on the banks and batture of the Mississippi river the famous Stuyvesant docks, covering about one mile of river front and constructed at a cost in excess of $1,000,000; the gist of that decision being thus given in Breaux’s Digest, p. 614, No. 18, to wit:
 

 “The common council of the city of New Orleans has no authority to enact an ordinance which authorizes a railroad corporation to erect buildings and other permanent structures upon the batture in front of its riparian property and on the banks of the Mississippi river”—citing New York v. Connecticut, 4 U. S. (4 Dall.) 2; Talbot v. Jansen, 3 U. S. (3 Dall.) 140, 1 L.Ed. 540; Henderson v. Mayor, etc., of City of New Orleans, 3 La. 563; Shepherd v. Third Municipality of the City of New Orleans, 6 Rob. 349, 41 Am. Dec. 269; Hanson v. City Council of Lafayette, 18 La. 295; Herbert v. Benson, 2 La. Ann. 770; Klein v. Coon, 10 La. Ann. 523; Sweeney v. Shakspeare, 42 La. Ann. 614, 7 South. 729, 21 Am. St. Rep. 400; Ruch v. City of New Orleans, 43 La. Ann. 275, 9 South. 473; Heirs of Leonard v. Baton Rouge, 39 La. Ann. 275, 4 South. 241; Pickles v. McClellan Dry Dock Co., 38 La. Ann. 412; Stevens v. Walker, 15 La. Ann. 577; Partida, 3, 8, 27; Curia Phillippica, lib. 3, cap. 16.
 

 This opinion and decree, rendered by a divided court (with the correctness whereof we are not presently concerned), nevertheless threw consternation into the commercial and public circles of the city of New Orleans, and in answer to an overwhelming public sentiment the convention, which met soon afterwards, adopted article 290 of the Constitution of 1898, reading as follows:
 

 “Art. 290. Riparian owners of property on navigable rivers, lakes, and streams, within any city or town in this state having a population in excess of five thousand shall have the right to erect and maintain on the batture or banks owned by them, such wharves, buildings and improvements as may be required for the purposes of commerce and navigation, subject to the following conditions, and hot otherwise, to wit: Such owners
 
 shall first obtain the consent of the council,
 
 or'other governing authority, and of the board of levee commissioners, within whose municipal and levee district jurisdiction such wharves, buildings, and improvements are to be erected, and such consent having been obtained, shall erect the same in conformity to plans and specifications which shall have been
 
 first submitted to, and approved by,
 
 the engineer of such council, or other governing authority; and when so erected, such wharves, buildings, and improvements shall be, and remain, subject to the administration and control of such council, or other governing authority, with respect to their maintenánce and to the fees and charges to be exacted for their use by the public, whenever any fee or charge is authorized to be and is made; and shall be and remain subject to the control of such board of levee commissioners, in so far as may be necessary for the maintenance and administration of the levees in its jurisdiction. The council, or other governing-authority, shall have the right to expropriate such wharves, buildings, and improvements, whenever necessary for public purposes, upon reimbursing the owner the cost of construction, less such depreciation as may have resulted from time and decay; • such reimbursement, however, in no case
 
 to
 
 exceed the actual market value of the property:
 
 Provided, that nothing in this article shall be construed as affecting the right of the state, or of any political sxCbdivision thereof, or of the several boards of levee commissioners to APPROPRIATE WITHOUT COMPENSATION SUCH WHARVES, RUILDING-S, AND IMPROVEMENTS, WHEN NECESSARY FOR LEVEE PURPOSES.
 

 “The grants made by the city of New Orleans under the terms of Ordinance 11765, Coun
 
 *165
 
 cil Series, adopted January 14, 1896, authorizing the construction, use and maintenance of wharves, structures, and improvements upon certain riparian property in the sixth municipal district, and other grants of the same nature .made by the city of New Orleans to riparian owners with reference to their property, are recognized as necessary aids to the commerce of this state, and are hereby ratified, and declared to be lawful, but
 
 shall in no event he construed as conferring greater privileges or rights than might he conferred under tlús article, on AS RELEASING THE RIPARIAN OWNERS FROM THE OBLIGATIONS HEREIN IMPOSED or which may have been imposed upon or assumed by such riparian owner by contract, municipal ordinances or otherwise.”
 
 (Italics and capitals ours.)
 

 IV.
 

 In the light of the foregoing, article 312 seems sufficiently clear in its general purpose:
 

 (1) It had no application outside of the Orleans levee district (the city of New Orleans) ;
 

 (2) Nor to property within said district, but actually
 
 rural
 
 in character and' extent; ' (3) Nor to batture property (already outside of the levee);
 

 (4) Nor to the “any part of the river front, the administration and control of which is vested, for the purposes of commerce, either in the state or city authorities” (to wit, the banks of the river, C. C. 455, 509, 665, 863);
 

 (5) Nor to improvements erected thereon, under such grants.
 

 (6) The compensation is limited to
 
 the value of the property appropriated.
 

 (7) And compensation, when due, need not be paid
 
 in advance,
 
 as in other cases of expropriation.
 

 The
 
 particular
 
 purpose thereof was to compensate property holders on or near the river front of Algiers, whose land and improvements had been sacrificed for the benefit of the other inhabitants, whilst at the same time assuming no obligation in future to such as occupied the bed and banks of the river, with structures erected thereon under public grants (actually invalid when made, and now confirmed as a matter of grace).
 

 But compensation is clearly due for the value of all property taken which is neither strictly rural in character and extent, nor batture property, nor the bank of the river, nor improvements erected on said bank or batture under grants from the public authorities (all other structures thereon erected being mere nuisances, or purprestures, abatable at any time by the public authorities, and therefore not property at all). Natchitoches v. Coe, 3 Mart. (N. S.) 141.
 

 V.
 

 [1]
 
 Prior to 1825 there was in this state no statutory definition of the bank of a river; none is found in the Partidas, and none in the Code of 1808. But the definition of the Roman law prevailed:
 

 ‘‘Ripa ea putatwr esse, quw plenissimum flumem continet
 
 (Digest 43, 12, 3, § 1). The bank is that which contains the stream at its highest stage” — meaning the stage of
 
 ordinary
 
 high water. Dig. 43, 12, 1, § 5.
 

 That definition was adopted in the Code of 1825, art. 448, with this addition:
 

 “Nevertheless on the borders of the Mississippi, where there are levees, the levees shall form the banks.”
 

 And in the Code of 1870, art. 457, the last clause was amplified by adding the words “and other navigable streams” after the word “Mississippi,” and the words “established according to law” after the word “levees.” So that the clause now reads:
 

 “Nevertheless on the borders of the Mississippi and other navigable streams, where there are levees, established according to law, the levees shall form the banks.” C. C. art. 457.
 

 Thus the legislation was made to conform to the
 
 fact;
 
 for as early as 1808 the
 
 location
 
 of levees" was placed under the control of public authority, and has remained so ever since.
 

 
 *167
 
 The act of February 15, 1808 (No. 1), provided, under penalties, that:
 

 “No inhabitant nor any other individual shall make any now levee, dyke or embankment, in front of those which exist at present, that is to say
 
 nearer the river than those actually existing, unless he shall previously have been authorized
 
 thereto, by a jury of twelve inhabitants, proprietors of' plantations situate on the banks of said river, convoked for that purpose by the parish judge.” (Italics ours.)
 

 Then followed the act of March 15, 1813, No. 40, placing levees under the control of the several police juries. Afterwards came the acts of March 18, 1816, No. 40, and February 7, 1829, No. 31, etc.
 

 So that it has always since 1808 been unlawful. for any individual to establish any
 
 new
 
 levees without permission from the public authorities. Pulley & Erwin v. Municipality, 18 La. 278. As no man is presumed to have violated the law, any existing levee must be presumed to have been established according to law, especially where the public authorities knew of the existence of such levees (as they could not help but know) and have acquiesced in the location thereof by keeping them up and repairing them. Hanson v. City Council of Lafayette, 18 La. 309, 310.
 

 VI.
 

 [2]
 
 In Packwood v. Walden, 7 Mart. (N. S.) 81, this court held that, regardless of whether certain land formed by alluvion and situated between the original front road and the existing levee belonged to the municipality or to the original proprietor, it was land acquired jure alluvionis, and was not
 
 public
 
 property, but the
 
 private
 
 property of the one or the other, and not subject to the servitude in favor of the public for navigation and commerce, saying:
 

 “A bank, quay", or wharf * * * is always public and destined to the use of all, as well as the port itself. But this public use cannot legally be extended farther than the bank or wharf, which is always distinct from alluvion | fully formed, and subjected by law to the ownership of private individuals or public bodies.”
 

 In Henderson v. Mayor, etc., 5 La. 416, the same principle was recognized, where the riparian owners had already furnished two public roads along the river front, both of which were still in use, and the city was seeking to appropriate, without compensation, sufficient land for new streets to be laid out on the land formed between the old front street and the existing levee. The court there said:
 

 “It appears, from the evidence in the cause, that two roads have been previously taken by the- public over the land which the plaintiffs now own. The first is proved to have existed 60 years, and is most probably that which was laid out immediately after the land was conceded, and in virtue of a condition express or implied in all grants of land by the former governments of Louisiana, tha't the grantee should furnish ground for a public highway. The second is of much more modern destination. Both ara now used by the public.
 

 “As the condition in the original grant has been complied with, we are compelled to look elsewhere for the authority of a municipal body to appropriate the land of individuals to their purposes, or to the use of the public, without compensation. Our researches in this object have been wholly unsuccessful. The Louisiana Code expressly declares, that ‘no one can be divested of his property, unless for some purpose of public utility, and on consideration of an equitable and previous-indemnity, and in a manner previously prescribed by law.’ La. Code.”
 

 Referring, then, to the acts of 1805, incorporating the city of New Orleans, and to Acts 1832, p. 132, relative to the opening of streets, etc., in said city, whereby compensation was to be paid to the owner for the loss suffered by him, the court continued:
 

 “Whatever power, therefore, the Legislature may have over private property, it is clear to xis that they have only delegated to the corporation of New Orleans the right to apply it to their or public use on paying the proprietor for the loss he may sustain by such a destination being given to the ground belonging to him; and we are equally clear that the corporation can possess no more authority on this subject than the Legislature has conferred on them.
 

 
 *169
 
 “It was, however, contended that this case presented an exception to the rule just stated, because here it was in the power of the corporation to have refrained from ordering the levee to be advanced nearer the river, and, if they had so refrained, the property would have remained batture, subject to the public use; it would have made a part of the bed of the river, and of the port of New Orleans. From these postulates, it is concluded that, as they had the power to make the ground susceptible of private ownership, they had a right to impose any conditions they pleased in rendering it so, and that hence the plaintiff cannot complain, if a part is appropriated to a road.
 

 “This reasoning, however specious it may at first appear, is not, in our opinion, sound. It proceeds on the idea that the permission to extend the levee is a boon conferred by the ppblic on the proprietor, which may be granted or refused on an arbitrary discretion. We, however, think that every front proprietor has a right to call for a jury, to decide whether the change in the levee can be safely made or not, and, if the facts require them to sáy so, that they have no authority to refuse the permission, because the owner will not surrender part of the property to the public, or burden it with servitudes to which other lands are not subject. The laws of the country give to the front proprietor all the batture formed in front of the soil owned by him on the banks of the river. When this batture has risen to a height to be susceptible of private ownership, it becomes as much his property as the land it is attached to. Motives of public policy, it is true, have induced the Legislature to prevent him from using it, without the consent of 12 riparian proprietors; but, when the public safety is not endangered, the consent ought not to be wantonly refused. At all events, if granted, it cannot be clogged with conditions inconsistent with the rights arising out of that situation of the property which authorizes the jury to permit the levee to be advanced nearer the river. The act of 1808, which requires a jury to be summoned, does not authorize any condition to be imposed in granting the permission asked for.”
 

 Nor is Ruch v. City, 43 La. Ann. 275, 9 South. 473, in conflict with the above; but, on the contrary, it is in perfect accord therewith. In that case, the original road having become impassable,-he who was truly the riparian owner was obliged to furnish a new one
 
 m lieu thereof
 
 without compensation under the express terms of C. C. art. 707 (703). The syllabus given by Justice Watkins makes all this quite clear at a glance.
 

 In Municipality No. 2 v. Orleans Cotton Press, 18 La. 122, 123 (36 Am. Dec. 624), plaintiff claimed—
 

 “title to and the possession of a parcel of ground lying in its front, within the limits of faubourgs Delord and Saulet, bounded in front on Front street * * * and in the rear by New Levee street, formed by alluvion from the Mississippi in front of said faubourgs, and now in the possession of and claimed by the Orleans Cotton Press Company.”
 

 The parcel of land above described is the same as that involved in Henderson v. Mayor, etc., supra, and—
 

 “the defendants have erected buildings and stores for pressing cotton, etc., and have appropriated the same to their sole and exclusive use as their property, and to the entire exclusion of the public, and have converted the natural and lawful destination of the said land to public purposes and uses into private property.” 18 La. 124, 210, 36 Am. Dec. 624.
 

 Also, within the last 10 years before the suit was filed:
 

 “There has been formed in front of the * * * land above described, by gradual deposit of the river, a considerable space of batture or alluvion, now vacant and unoccupied except for public uses, and which is in like manner [claimed to be] vested in the * * * municipality for public use and benefit, and * * * defendants, pretending to claim the same as their private property, and as forming a part of the ground described, had menaced and * * * are about to occupy the same and convert it to their own use to the exclusion of the public.” 18 La. 210, 36 Am. Dec. 624.
 

 Plaintiff prayed for judgment recognizing the
 
 title
 
 to all of said property to be vested in them, and enjoining defendant from any use, occupation, or possession thereof. 18 La. 124, 210, 36 Am. Dec. 624.
 

 The defendants pleaded res judicata as to the land first described, and occupied by buildings, to wit, Henderson v. Mayor et al., supra, and claimed
 
 title
 
 to the rest and right of possession.
 

 
 *171
 
 The lower court maintained the plea oí res judicata as to the land on which the cotton press stood (18 La. 125, 211, 30 Am. Dec. 024), and as to the rest gave judgment—
 

 “decreeing * * * the space of batture now vacant and unoccupied, lying front of the cotton press, situate outside of the levee and road established by the corporation, to and vesting it in the plaintiffs for public use and purposes.” 18 La. 126, 211, 36 Am. Dec. 624.
 

 Defendant appealed, and the plaintiff answered the appeal, praying for a modification of the judgment on the plea of res judicata, and this court held that “the whole ease is fairly open before us on the merits.” 18 La. 212, 36 Am. Dec. 624.
 

 The real issue in the case was the
 
 title
 
 to the batture; the question of the public servitude thereon was hardly involved at all; it was certainly not gone into by the court. If the court considered that question at all, it was answered by the
 
 decree,
 
 reading as follows :
 

 “That the judgment of the parish court be annulled, avoided, and reversed, and that ours be for the defendants, with costs in both courts, reserving, however, to the public the use of the levee, and of all the alluvion which existed at the inception of this suit, or which now exists, or may hereafter be formed, between the levee and the river, to be administered exclusively, and its use regulated, according to law, by the city council of the Second Municipality.” 18 La. 241, 36 Am. Dec. 624.
 

 Judge Martin dissented, holding that, when the faubourgs were laid out by the former' proprietors, leaving an open space between the front row of houses and the water, this evidenced an intention to dedicate such space to public use, thus putting such faubourg in the same position as the original city. But the rest of the court thought otherwise.
 

 This case therefore really decides nothing as to the extent of the servitude due the public on the banks of the Mississippi river. If it does decide anything on that point, it is that such servitude extends only over the levees and the batture formed between the levees and the river.
 

 VII.
 

 Defendant lays much stress on the following expression of Judge Bullard, which immediately precedes the decree just above mentioned, to wit:
 

 “The defendants (Cotton Press) must be considered as owning down to
 
 the road last laid out,
 
 and the intervention of the road does not in law prevent their being regarded as front proprietors. * * *” (Italics ours.)
 

 We confess that we are at a loss to understand just why the learned judge made any reference to
 
 the road last laid out.
 
 Eor Judge Bullard had taken part in Henderson v. Mayor, supra, and that record was before him as part of the matter he was then considering, ' in which case it had already been decided* that the soil over which had been built
 
 the road last laid out
 
 was private property, for which the municipality must pay before laying out that road. We conclude that the judge meant only this: That, as the municipality had
 
 paid
 
 for the road,
 
 that
 
 did not belong to the Cotton Press, and he was merely anticipating or answering some argument that such purchase made the municipality a front proprietor — a contention after-wards again made in Ruch v. City, supra, and again denied by this court. This much, however, is certain: That the learned judge knew that land bounded by a
 
 road,
 
 was an ager limitatus and not entitled to the jus alluvionis (which he recognized as existing in this ease), and he could not have meant by a single sentence to wipe out the definition of the Code, heretofore mentioned, and substitute in lieu thereof one of his own, to wit, that the
 
 public road
 
 and not the
 
 levee
 
 formed the banks of the river.
 

 VIII.
 

 But, be the above as it may, in addition to Packwood v. Walden and Henderson v. Mayor, supra, the court (still composed of the
 
 *173
 
 same judges who took part in the Cotton Press Case) again
 
 unanimously
 
 held in Dennistoun v. Walton, 8 Rob. 211 (214), that—
 

 “The space between the public road and the levee is private property, to the exclusive use of which the otvner is entitled.”
 

 But the public has the use of the bank (i. e., the levee) and batture outside of it for purposes of commerce and navigation.
 

 This was approved in Carrollton R. Co. v. Winthrop, 5 La. Ann. 36 (37), in Lyons v. Hinckley, 12 La. Ann. 655 (657), and in Hyde v. Teal, 46 La. Ann. 645 (653), 15 South. 416.
 

 In St. Anna’s Asylum v. New Orleans, 104 La. 392, 29 South. 117, this court held only that the doctrine in Dennistoun. v. Walton, supra, must not be taken so broadly as to include cases where the banks had been extended
 
 artificially,
 
 by the municipality, for the purpose of increasing the width of the landing, and such landing was
 
 still in the possession
 
 of the municipality, and was necessary
 
 for,
 
 and actually in use as, a landing. To the same effect see Leonard v. Baton Rouge (on rehearing) 39 La. Ann. 285, 4 South. 241.
 

 Of the many other cases to which we are referred, we do not see that any touch the question now before the court, which is, “Is the land between the levees and the public road part of the bank of the fiver, over which the public has a servitude for purposes of commerce and navigation?” Which question we conceive to be finally answered by the
 
 six
 
 cases just above mentioned. This is a rule of property, and we now affirm it for the
 
 seventh
 
 time.
 

 IX.
 

 [3, 4]
 
 As to the last four i items of plaintiff’s claim, aggregating $157,446.92, these may be dismissed at once with the simple statement that plaintiff has no other cause of action against this defendant than that given him by article 312 of the Constitution of 1898, above mentioned, and by the very terms of that article the only right of action given him is for
 
 the value of the property appropriated,
 
 which right of action is purely statutory; that is to say, originates exclusively from said constitutional grant, qnd does not exist apart therefrom. Hence plaintiff’s claim, if any he has, must be limited to the right given him by that constitutional provision, to wit, the value of the property appropriated.
 

 X.
 

 As to the first four items of plaintiff’s claim, we find as a fact that for more than 50 years there stood on the banks of the river at this point a good and sufficient le+ee, which answered fully for the protection of that bank of the river from overflow, and that in the year 1914 that same levee had been reconstructed with the approval of the Orleans levee board and its engineers. It is true that there is some conflict of testimony as to whether or not plaintiff, at whose "expense the levee was reconstructed, did the work in exact accordance with the requirements (as to construction) of the board and its engineers; but there is absolutely no conflict whatever over the location of said levee, and that is all we are now concerned with. Suffice it to say in any event that said levee, so constructed, stood
 
 where it teas
 
 with tlie full knowledge of the levee board and its engineers, from that time (1914) until the new levee was constructed in 1920, and that it served as the only protection against the flood of the river at that point, and sufficed for that purpose.
 

 We find further as a fact that the area between that levee and Patterson street was fully 42,000 square feet. This we value at $2 per square foot. The defendant’s experts valued it at 75 cents per square foot, after virtually agreeing on $1, and did so upon figures which we consider altogether unreliable, to wit, prices paid many years before and" some of it for property not even situ
 
 *175
 
 ated on the river front. One expert for plaintiff placed the value at $3, and three placed it at $2.50; but the controlling factors with us are these: That the Johnson Iron Works financed their enterprise, and placed their securities with some of the most prominent bankers of the city, on a basis of something in excess of $2 per square foot for property situated exactly as this property is (in fact adjoining it), and its securities issued on that basis are selling well on the public market. Again, this same Johnson Iron Works offered to buy from defendant any part of said property, of 20 feet or more in depth, for the sum of $50,000, if the levee board would leave that much of the land, instead of taking it all. The greatest extent of land which might have been left, had the levee board thought proper to run the levee straight, instead of making an offset at this point (as it did) would have been about 90 feet in depth or about one-half of the depth of the property (170 feet); so that a valuation of $84,000 or $85,000 for the whole property seems about fair.
 

 The evidence shows that the sawmill, and all its machinery, except perhaps some light pieces, were situated and had their foundation inside of the levee. This mill and machinery are valued by p’aintiff’s main expert at about $37,000, and by another it is said that it could not have been replaced for much more than that sum, and defendant’s own expert placed the value thereof, as it stood, at $30,000. We think this last figure correct.
 

 It is not so easy to reach exact figures as to the value of the buildings and other improvements on the land. Plaintiff and his experts value them at about $13,000, and a careful examination of the plans and photographs thereof shows that this estimate cannot be far from their actual value; at the same time a part thereof stood actually upon the levee (though no very great part). On the whole, we think that the structures
 
 inside
 
 the levee were well worth some $10,000 or $11,000.
 

 Adding together $85,000 for the land, $30,-000 for the mill and machinery, and $10,000 for the structure, we reach exactly the same figures reached by the jury, to wit, $125,000.
 

 XI.
 

 A great deal of testimony was taken to show that the levee board acted arbitrarily and with prejudice when they refused to save plaintiff’s land by building the levee
 
 outside
 
 of the mill, and when they even refused to leave him that part of the land which they might have left by running the levee on a straight line instead of making a
 
 detour
 
 around his property.
 

 We do not think the charge has been established (and, if it had been, it would have been immaterial to this case). The fact is that the advisability of building the levee outside of plaintiff’s mill was at least doubtful, and for the rest the board thought, upon advice, that it had the right to take without compensation all of the land between the river and the public road, and, so believing, it endeavored to save the cost thereof to. the public, perhaps upon a well-meant, but wholly impractical, theory that the mill could continue to operate outside of the levee, and dispose of its products by means of a “telphus” system to carry them above and across the street, a'nd elevators to let them down to the street level. But we find no evidence herein of any deliberate purpose to injure plaintiff wantonly.
 

 Decree.
 

 The judgment appealed from is therefore affirmed.
 

 Rehearing refused by Division A, composed of Chief Justice PROVOSTX and Justices OVERTON and LECHE.