stitution (Const. 1921, art. 6, § 12) and statutes of this state on the subject.

The good moral characters and qualifications of respondents as practicing dentists are conclusively shown by the record in this case, and the public is fully protected as far as their practice of dentistry is concerned.

It is therefore ordered that the judgment appealed from be annulled and reversed.

It is now ordered that relators' demand be rejected, and that relators' suit be dismissed at their costs.

150 So. 295

## MAYER v. BOARD OF COM'RS FOR CADDO LEVEE DIST.

No. 32211.

July 7, 1933.

Rehearing Denied Oct. 3, 1933.

Tucker & Mason, of Shreveport, for appellant.

Jackson & Smith and Charles L. Mayer, all of Shreveport, for appellee.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for amici curiæ.

Jeff B. Snyder, Dist. Atty., of Tallulah, and Hudson, Potts & Bernstein, of Monroe, for Board of Com'rs for Fifth Louisiana Levee Dist., amicus curiæ.

OVERTON, Justice.

Plaintiff owns Shreve Island plantation, located on Red river, in the parish of Caddo. Towards the close of 1930, and in the early part of 1931, defendant constructed a new levee through the plantation. This levee actually occupies 29.20 acres with the base, the

berm, and the borrow pits. Between the new levee and the old, there was left, or thrown outside of the new levee, 105.99 acres, making a total of 135.19 acres lying between the land toe of the new levee and the land toe of the old levee.

The assessed value of the land for the year 1929, the year preceding the commencement of the building of the levee, was $100 an acre. Defendant paid plaintiff $2,920, on the basis of $100 an acre for the 29.20 acres actually occupied by the base, the berm, and the pit of the new levee, but refused to pay for the land between the old and the new construction. This refusal brought on this suit. Its purpose is to recover the assessed value of $100 an acre for the total acreage of 135.19 acres used, destroyed, and thrown out, less the 29.20 acres, paid for by defendant.

Defendant filed an exception of no cause of action. The exception was overruled. It then answered the demand, and averred in the alternative (which it is important to note, since the alternative answer may call for the remanding of this case), the following:

"Answering further, and alternatively, and only in the event the court should hold the provisions of article 16, section 6, of the Constitution of 1921, to apply to land left outside of the levee, and not actually occupied by it, then and in that event, defendant shows that plaintiff, since the construction of the new levee, has continued to occupy and use the land between the old and new levee in the same manner and for the same purposes to which said land was dedicated prior to the construction of the new levee; that, in fact, plaintiff's land, involved here, has not been actually used or destroyed for levee purposes."

There was judgment below in favor of plaintiff, based upon the acreage actually occupied by the base of the levee, the berm, and the borrow pits, and the land, lying between the new and the old levee, at its assessed valuation, the judgment being for $13,519, less $2,920, paid, with legal interest from July 28, 1930, and further judgment, reserving the privilege to defendant to pay the amount of the judgment into the registry of the court, there to remain until the further orders of court.

The case, as finally decided, presents two questions for consideration. The major one, by far, is the question whether property, thrown outside of a new levee, under construction, and lying between that levee and the old one, is used or destroyed for levee purposes within the meaning of section 6 of article 16 of the Constitution of 1921. The second question, which is one arising incidentally from the decision, is whether the court may order properly that the levee board be reserved the privilege of paying the compensation due the property owner into the registry of the court, when the land is incumbered with a mortgage at the time judgment is rendered, for the protection of the levee board and the mortgage creditor.

Section 6 of article 16 of the Constitution of 1921, upon which the rights of the litigants herein depend, reads as follows:

"Lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes shall be paid for at a price not to exceed the assessed value for the preceding year; provided, this shall

not apply to batture, nor to property control of which is vested in the State or any subdivision thereof for the purpose of commerce.

"If the district has no other funds or resources out of which such payment can be made, it may levy, on all taxable property situated therein, a tax sufficient to pay for said property so taken, not to exceed one-fourth of one mill on the dollar, to be used solely in the district where collected. This shall not prevent the appropriation of said property before payment."

The law imposes a servitude for the common utility on lands abutting navigable streams for the construction and repair of levees, roads, and other purposes. Civ. Code, art. 665. The principle recognized by the cited article of the Code is of ancient origin. Morgan v. Livingston, 6 Mart. (O. S.) 19, 235, 236; Ruch v. New Orleans, 43 La. Ann. 275, 9 So. 473; Eldridge v. Trezevant, 160 U. S. 452, 463, 16 S. Ct. 345, 40 L. Ed. 490.

In the early days of this state, the levees were built and maintained solely at the joint expense of the front proprietors, and were diminutive constructions compared with present-day levees. Gayare's History of Louisiana, vol. 2, p. 2; Ward v. Board of Levee Commissioners, 152 La. 158, 166, 167, 92 So. 769, 772. The construction of levees came under public supervision as early as 1808. See Act of February 15 (No. 1) of 1808, and Ward v. Board of Levee Commissioners, supra.

To illustrate the size of levees in the early days as compared with the levees of to-day, even after their construction came under public supervision, and as late as 1829, we may refer to Act 31 of that year, the second section of which specifies the number of feet wide the base of each levee should be, depending on the depth of the water to be held back by the levee, as well as the number of feet its height and the width its summit should be. Where the levee was to hold back water of the depth of one foot, and not more than 3 feet, the base was required to be 5 feet wide for each foot in height, and, where the levee was to hold back more than 6 feet of water—the greatest depth specified—the levee was required to have a base of at least 8 feet for every foot in height. The summit of each levee was required to be of the breadth of one-third of its base, and the general requirement was made that every levee should be of such height that, after the settling of the earth, it would be one foot above the level of the water at its highest. By section 3 of the act, at places where the bank was apt to cave, it may be observed, in passing, the levee was required to be constructed at least one arpent from the water's edge, and in places where this condition did not exist at a distance of at least 60 feet therefrom. In both instances the measurement was required to be from the summit of the bank of the river.

Pretermitting reference to article 312 of the Constitutions of 1898 and 1913, which affected the Orleans levee district alone, up to the promulgation of the Constitution of 1921, the public authorities, in taking advantage of the servitude for levee purposes, and in the proper exercise of the police power, upon which power the servitude may be said to rest, paid nothing to the owner of the land for such part of his land as was taken for levee purposes, or for such part as was

thrown outside of the levee. Zenor v. Parish of Concordia, 7 La. Ann. 150; Police Jury of West Baton Rouge v. Bozman, 11 La. Ann. 94; Dubose v. Levee Commissioners, 11 La. Ann. 165; Bass v. State, 34 La. Ann. 494; Ruch v. New Orleans, 43 La. Ann. 275, 9 So. 473 (which, though a road case, is applicable in principle); Peart v. Meeker, President of Levee District, 45 La. Ann. 421, 12 So. 490.

It appears, therefore, from the foregoing, that whatever section 6 of article 16 of the Constitution of 1921 may give to the owner of land, subject to the servitude for levee purposes, is in the nature of a gratuity. It is a payment made by the agency of the state —the levee district—for what already belonged to the state at the time of the adoption of the Constitution. The Constitutional Convention of 1921 was evidently prompted, in adopting the provision, to lessen, so far as the means of the public authorities would permit, the burden of the servitude resting on lands, bordering on navigable streams, and growing out of the necessities of the situation. Care should be taken, therefore, not to carry the spirit of the provision beyond its clear intendment, and thereby render, perhaps, the state unable to discharge its duty of protecting a large part of the public from inundation.

In construing section 6 of article 16 of the Constitution of 1921, it is proper to look into the proceedings, touching the framing and adoption of the section before us, remembering that the Constitution was not only framed by the Convention, but was adopted and promulgated by it, without referring it to the people, thus giving increased weight, perhaps, to its proceedings in interpreting the provisions of the instrument which it finally adopted and promulgated as the Constitution.

In the Convention, as appears from the journal thereof, there was a divergence of thought as to what should be done touching payment for land appropriated for levee purposes. Some, as appears from the several ordinances offered in the beginning, advocated payment, while others apparently opposed it. For instance, an ordinance by Mr. Livaudais provided that private property, irrespective of location or character, shall not be taken nor damaged for public purposes, nor for levee purposes, without just and adequate compensation being first paid. Journal of Convention, p. 333. The several ordinances offered, relative to levees, were reported by the committee on internal improvements and levees, by substitute, as Ordinance No. 464. Journal of Convention, p. 477. On the second reading of Ordinance No. 464—the substituted ordinance—Mr. Morrison moved to strike from it the words "used for the location of the proposed levee and the area actually used in the construction of such levee," and to insert in lieu thereof the words "property which, being protected from overflow by the levee system, is exposed or subjected to overflow by reason of the abandonment of the then existing levee, and the rebuilding of the same further back from the river." Journal of Convention, p. 481. The substituted ordinance (Ordinance No. 464) was recommitted on May 6, 1921, with the amendments thereto. Journal of Convention, pp. 613, 614. The substituted ordinance, with its amendments, was itself reported by sub-

stitute as Ordinance No. 485, on May 23, 1921. Journal of Convention, pp. 745, 746. The ordinance, as reported to the Convention by the committee, contains the present language of section 6, article 16, of the Constitution. The only changes made in the section, after the ordinance was reported, were changes in punctuation. The ordinance was finally passed on May 30, 1921, by a vote of one hundred and two to nothing, forty-four being absent. Journal of Convention, pp. 834, 835.

From the foregoing, it will appear that Ordinance No. 367 by Mr. Livaudais and the amendment to the substituted Ordinance No. 464, tendered by Mr. Morrison, both of which made it inescapable that "thrown out" lands were to be paid for, were impliedly rejected by the Convention, and instead the words "actually used or destroyed for levees and levee drainage purposes," as relates to such lands, were employed.

■ The purpose of the Convention, we think, in employing the words "actually used or destroyed," which clearly mean actually used or actually destroyed, was to make it clear that land, in constructing a levee properly and with due regard to all concerned, which is thrown outside of the levee, is not required to be paid for, but only such as has been actually used in the construction of the levee or has been actually destroyed, for all reasonable purposes, by its construction. This much the convention manifestly thought levee districts could do to lighten the burden, caused by the levee servitude, resting upon lands, located upon navigable streams, but we think the language used denotes also that the Convention thought that these districts could not go so far, without endangering their ability to construct proper levee systems, as to pay for land not so destroyed, which may be thrown outside of the levee, in constructing an efficient system.

Section 6 of article 16 of the Constitution has been before this court for construction and application on several occasions, chiefly in Russell v. Board of Commissioners, 159 La. 330, 105 So. 361; Boyce Cottonseed Oil Manufacturing Co. v. Board of Commissioners, 160 La. 727, 107 So. 506, 507; and Green v. Board of Commissioners, 163 La. 117, 111 So. 619.

In the Russell Case, which was the first one to come before us under section 6 of article 16 of the Constitution, it appears that the levee broke in front of plaintiff's property, and washed away 19 acres of his land. The levee board built a new levee, which occupied 14.50 acres of plaintiff's land, and left on the outside of the levee 38.93 acres of his land; that is, 38.93 acres, lying between the line of the old levee and that of the new. The claim for compensation for the 19 acres washed away was disposed of on the ground that they had not been destroyed for levee purposes, but instead by an act of God. Hence these 19 acres have no bearing on the question, here involved. The 14.50 acres occupied by the new levee also lose their importance, as to the question, here involved, for it was not disputed that plaintiff was entitled to compensation for them. The acreage in dispute, as concerns the right to compensation, was the 38.93 acres, thrown outside of the new levee. In disposing of the right to compensation, as to this acreage, the court said: "As to the 38.93 acres, now placed outside of the levee, we think they were 'destroyed'

within the meaning of the Constitution. They are now in the bed of the river, and are thus public property to all intents and purposes, and no longer available to the owner for any private purpose whatsoever"—citing authorities, among them Civil Code, arts. 453 and 457.

In the Boyce Cottonseed Oil Manufacturing Co. Case, the number of acres thrown outside of the levee was 5½ acres, upon which there was a cottonseed oil mill, assessed for taxation in the sum of $14,500, the land itself being assessed for $500. The court in that case, on the original hearing, said:

"Comparing the language of the first paragraph of said section [referring to section 6 of article 16 of the Constitution], to wit, 'lands and improvements thereon actually used or destroyed for levees,' with the language of the second paragraph thereof, to wit, 'property so taken,' we readily perceive that lands used or destroyed for levees means simply lands taken for levees. And since to take is to appropriate, and vice versa, it follows that land taken for levees has precisely the same meaning in the foregoing section as land appropriated for levee purposes has in article 312 of the Constitution of 1898."

The court thereafter cited, among other authorities, the Russell Case, saying: "We [there] held that land thrown outside a levee was land destroyed for levees, within the meaning of Const. of 1921." The court then concluded that plaintiff's land and mill were actually destroyed for levee purposes. On rehearing, the same conclusion was reached, and the original opinion and the decree were reinstated.

There was involved in the Green Case 1.53 acres of land, which included the land occupied by the new levee, as well as the land thrown outside of that levee. The part thrown out was, we infer, extremely small in area, for of the 3.60 acres, originally comprising the tract, .17 of an acre was washed away by the flood, which occurred prior to the erection of the new levee. The court allowed for the small fraction of an acre, thrown outside of the new levee, but it may be observed that no question was raised, and properly so, concerning the propriety of allowing for it, as property actually destroyed.

It is a fundamental rule that in construing the decisions of a court they must be construed with reference to the facts involved. Bearing this rule in mind, the foregoing decisions may be reconciled with the views herein expressed, as to what is meant by the words "actually used or destroyed," appearing in section 6 of article 16 of the Constitution, barring one or two expressions, not essential to the decrees therein. It will be observed that in each of these three cases the land, thrown outside of the new levee, was in area sufficiently small to be deemed, without difficulty, "actually destroyed," for all practical purposes.

However, there is an expression in the first two of them, which, when the facts upon which the decisions rest are considered, are not inappropriate, yet, if the expression be applied to a somewhat different state of facts, they become misleading and bring about error. This expression is one arising, we take it, out of article 457 of the Civil Code, which is cited in support of it, and is (referring to the acres thrown outside of the

new levee), as follows: "They are now in the bed of the river [then relying, we take it, on article 453 of the Civil Code], and are thus public property to all intents and purposes, and no longer available to the owner for any private purpose whatsoever." The first article cited, article 457, defines the banks of a river or stream (following, in the first paragraph of the article, the Roman law) as follows:

"The banks of a river or stream are understood to be that which contains it in its ordinary state of high water; for the nature of the banks does not change, although for some cause they may be overflowed for a time.

"Nevertheless on the borders of the Mississippi and other navigable streams, where there are levees established, according to law, the levees shall form the banks."

Article 453 of the Civil Code, also cited in support of the foregoing ruling, defines "public things," and among the illustrations given are "the beds of rivers, as long as the same are covered with water."

When article 457, defining the banks of rivers, was carried into the present Code (the Revised Civil Code of 1870 with its numerous amendments), levees, comparatively speaking, were small affairs, and were generally constructed close to the river, say between 60 feet and an acre or two. The levees could then serve with some degree of exactness as the banks of the river, and may do so, in many instances, now. To-day, however, the levees are usually built much larger, and not infrequently some distance from the natural bank of the river. As for example (though this would seem to be an extreme case) in

Wolfe v. Hurley (D. C.) 46 F.(2d) 515, the levee was set back 4 or 5 miles from the river. To apply the codal definition of the banks of a river, and thereby make, with the aid of article 453 of the Civil Code, all land lying between the levee and the river a part of the bed of the river, and a public thing, no longer available for private use, without reservation or qualification, to present methods of building levees, would be going further, we think, than the Legislature ever intended by its enactment. But, be all of this as it may, we think that the Constitutional Convention made it clear that the treating of levees, without qualification, as the banks of navigable rivers, should not be a factor in determining what land is "actually used or destroyed for levee purposes," else why the use of the word "actually" before the words "used or destroyed." The use of that word would seem to mean that the Convention intended that the land must be, in fact, destroyed or used before the owner could demand payment, and not figuratively destroyed by what may be often a legal fiction, by reason of its particular application to facts.

We think that we went too far in the case of Boyce Cottonseed Oil Manufacturing Co. v. Board of Commissioners, when, as appears from the quotation therefrom, appearing above, we held that the expression "property so taken," appearing in the second paragraph of section 6 of article 16 of the Constitution which has reference to land "actually used or destroyed for levee purposes," appearing in the first paragraph of that section, has the same meaning as property appropriated for levee purposes, appearing in article 312 of the Constitution of 1898 (which article relates

only to the Orleans levee district), under which it was held that payment for thrown out lands should be made. The difference in language between section 6 of article 16 of the Constitution of 1921 and article 312 of the Constitution of 1898 tends to show that the same construction that was given article 312 of the Constitution of 1898, on the question here involved, was not intended to apply to section 6 of article 16 of the Constitution of 1921. Land that is actually used or destroyed for levee purposes is appropriated for such purposes, but it does not follow that land appropriated for levee purposes is actually used or destroyed for such purposes. The latter expression is broader than the former. For these reasons, and for those already given in construing section 6 of article 16 of the Constitution of 1921, we have not cited or reviewed the jurisprudence, construing and applying article 312 of the Constitution of 1898, such as the cases of Louisiana Society for Prevention of Cruelty to Children v. Board of Levee Commissioners, 143 La. 90, 78 So. 249, and Ward v. Board of Levee Commissioners, 152 La. 158, 92 So. 769.

As observed by Judge Dawkins of the United States District Court, and until recently a justice of this court, "To now hold that the levee boards must pay for all lands which are left outside the line of a new levee would be to give full effect to the most extreme proposal in the convention, to wit, that of Mr. Livaudais, above quoted." Wolfe v. Hurley (D. C.) 46 F.(2d) 515, 523; Id., 283 U. S. 801, 51 S. Ct. 493, 75 L. Ed. 1423. As will be recalled, Mr. Livaudais' proposal, which was defeated in committee, was to pay for all thrown out lands.

■ Our conclusion is that the levee district cannot be required to pay for thrown out lands unless they are actually destroyed for all reasonable purposes. Since the trial judge ruled out all evidence tending to show whether the land, thrown outside of the new levee, was actually destroyed for such purposes, there is nothing left for us to do but to set aside the judgment and remand the case, to the end that evidence may be received on that phase of it. Defendant contends that it is in position to establish that, with the protection that the thrown out land has had from the old levee, it has not been overflowed for years, and that, since the construction of the new levee, plaintiff has cultivated and used the land, thrown outside of that levee, as she did before its construction. Defendant should be given an opportunity to show such facts and plaintiff an opportunity to rebut them.

We see no reason to pass on the question as to the right of the trial court to reserve the privilege to defendant to pay such judgment as may be awarded against the board, in view of the mortgage against the property, into the registry of the court, there to remain until the further orders of court. It will be time enough to dispose of that question when judgment is rendered against the district, should it be so rendered, and when the same right is reserved, should it be reserved.

For the reasons assigned, the judgment appealed from is set aside, and this case is now remanded to be disposed of consistently with the views here expressed, plaintiff to pay the costs of this appeal, and the remaining costs to abide the final decision of the case.

ST. PAUL, J., dissents.