**GENERAL BOX CO. v. UNITED STATES et al.**

Civ. Nos. 2536, 2804.

United States District Court,
W. D. Louisiana, Monroe Division.

Oct. 14, 1952.

Fred G. Benton, Baton Rouge, La., Carl A. Chadwick, Natchez, Miss., Barnett, Barnett & Jones, Jackson, Miss., Jackson B. Davis, Shreveport, La., for plaintiff.

William J. Fleniken, U. S. Atty., Shreveport, La., Thompson L. Clarke, St. Joseph, La., for defendants.

DAWKINS, Chief Judge.

These two cases present the same issues and have been consolidated for trial and decision. They involve claims for the value of timber alleged to have been destroyed in the enlargement of a levee on the main stream of the Mississippi River. The first numbered was filed November 30, 1948, and the second on October 19, 1949. The demands were made under the Tucker Act and, in the alternative, the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–2680, but the latter ground has been abandoned.

Alleging itself to be the owner and in possession for more than one year of cer-

tain timber adjacent to the levee, as disclosed by copies of deeds or conveyances annexed, the complainant charges that defendant and its agents "willfully, arbitrarily and wantonly destroyed the said timber * * * to the value", in each case, of $9,000, "without the knowledge, consent and permission of plaintiff", at a time when defendant knew or was charged with "knowledge of plaintiff's said ownership"; that said conduct was contrary to and in violation of both the federal and state laws dealing with such matters, particularly the Fifth Amendment of the Federal Constitution, requiring adequate compensation for private property taken for public purposes; and that said work was done under the "Flood Control Program involving the whole of the lower Mississippi River".

Motions to dismiss both cases on the ground that the complaint did not state claims upon which relief could be granted were overruled, 94 F.Supp. 441, and a third party complaint was filed by the defendant on January 31, 1951, bringing in the Fifth Louisiana Levee District as a defendant.

Other preliminary matters having been disposed of, the case was tried upon its merits, both as to the main demand and the third party complaint. There is no denial that timber belonging to the plaintiff was destroyed, but there is a dispute as to the quantity and value. The issues otherwise are largely those of law.

Plaintiff states its contention under three headings: (1) the Federal Flood Control Act, as amended by the Act of August 18, 1941, Tit. 33, § 701, et seq., U.S.C.A., "suspends operation of the state law in reference to the acquisition of rights of way insofar as local contributions are concerned"; (2) that it is admitted the timber was destroyed in the prosecution of "lower Mississippi River Project under the 1941 amendment of the Flood Control Act which supersedes" the state laws of riparian servitude "as to local contributions * * *"; (3) there was no appropriation or expropriation of the timber by either the Government or State; and (4) the timber was destroyed without notice to the owners and in an unreasonable and unnecessary manner.

On the other hand, defendant: (1) denies any liability or responsibility whatever, and alleges that the Fifth Louisiana Levee District was bound under federal law to furnish the rights of way without cost to the Government, for which reason, if recovery is allowed, it should have judgment over and against said Board; (2) that the Board exercised its lawful power of appropriation under the servitude imposed by the LSA–Civil Code of Louisiana, art. 707 et seq., and if not, then the Government was empowered to do so under its own right; and (3) neither the nation nor the Board is liable for the destruction of the timber for the reason that it was growing on batture, which is excluded as compensable by Section 6 of art. XVI of the State Constitution; and, in the alternative, if not batture, then neither the Government nor the Board is liable therefor because "plaintiff neither proved nor alleged the assessed value of the property" as it was required to do under the said provision of the State Constitution.

The facts are found specifically as follows:

In Case No. 2536, the timber which was on Roseland Plantation was first acquired by plaintiff's predecessor, Natchez Veneer Company, in April, 1943, from one John A. Birdwell. Plaintiff acquired the property of the Veneer Company about 1945, and because the time for cutting was about to expire, on September 21, 1946, it purchased, for the price of $30,000, the property in fee, including the timber. It then sold the land to Orrin James on the 15th day of November of that year, for the sum of $15,000. In the sale to James, plaintiff reserved "all the timber of every kind and character whatsoever now standing, growing and being on the above described lands, or which may hereafter grow thereon, for a period of twenty (20) years * * *".

In Case No. 2804, the timber was a part of that which was purchased from R. B. Sharp on April 9, 1947, for the price of $36,000, by a deed reciting that plaintiff was "to have ten (10) years from the date

of this deed for the removal \* \* \* and at the end of said period, all timber uncut and removed is to revert to the vendor".

As stated earlier, there is no dispute that the timber was destroyed, but the amount and value is in contest. Boiled down, the legal questions are: first, did the Government or Levee Board have the legal right to destroy it without paying its fair value, or at least the assessed value; and second, did the fact that it was not assessed separately for the year 1946 prevent the plaintiff from recovering even that value? There are also incidental issues as to whether, in taking and destroying the timber, the Government could avail itself of the limitations of Sec. 6 of art. XVI of the State Constitution through its own action or that of the Levee Board; and, finally, was the land on which the timber was growing batture, excluded as compensable by that Article.

■ The Fifth Amendment to the Federal Constitution provides, among other things, " \* \* \* nor shall private property be taken for public use, without just compensation". This, of course, applies to the Federal Government.

The State Constitution also provides, art. I, Sec. 2, that:

"No person shall be deprived of life, liberty or property, except by due process of law. Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."

Art. XVI, Sections 5 and 6, dealing with levees, declares:

"*Sec. 5:* All governing authorities of districts which have been, or may be created, are authorized to cooperate with the Federal Government in the construction and maintenance of the levees in this State, on such terms and conditions as may be provided by the Federal authorities and accepted by the State authorities."

"*Sec. 6:* Lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes \* \* \* shall be paid for at a price not to exceed the assessed value for the preceding year; provided, that this shall not apply to batture, nor to property the control of which is vested in the state or any subdivision thereof for the purpose of commerce \* \* \*.

"If the district has no other funds or resources out of which such payment can be made, it may levy, on all taxable property situated therein, a tax sufficient to pay for said property so taken, \* \* \* not to exceed one-fourth of one mill on the dollar, to be used solely in the district where collected. This shall not prevent the appropriation of said property before payment."

Prior to the State Constitution of 1921, under the Civil Law all property bordering on a navigable stream bore a servitude in favor of the public, requiring the owner to give, without compensation, so much thereof as was reasonably necessary for levees and public roads. LSA–Civil Code, arts. 707,665 and 457,455. The modification of this rule, as embraced in said Sec. 6 of art. XVI, was a compromise between elements in the convention, one side contending that full compensation should be paid, while the other insisted that there should be no change. The writer, a member of that convention, was requested by the contending elements to work out an acceptable solution, and the quoted provision was the result. It applies to State action.

■ There appears to be no exception to the requirement that when the Government in its own right takes private property for public use, it must pay "just compensation". Notwithstanding the servitude of the civil law, just mentioned, lands fronting on a navigable stream and everything on them having value as property belongs to the riparian owner, down to the mean low water line, LSA–C.C. arts. 455, 457, and may be used, bought and sold even after the construction of levees, the same as any other private property. Timber, oil, gas and other minerals may be taken therefrom by the owner, subject, of course, to the right of the State to insist that levees, public roads, etc., shall not be interfered with or damaged. It is also well settled that the

984

Government may build levees and other public works in or adjacent to navigable streams in aid of navigation and flood control, the terms and conditions of which are determined by Congress and carried out by the Board of United States Engineers. Until the amendment of the Flood Control Act, Title 33, § 701 et seq., U.S.C.A., by the Act of August 18, 1941, to carry out the lower Mississippi River Project, Congress, admittedly, had exacted of the states that they furnish all rights of way for levees on the main stream of the Mississippi River without cost to the Government. The plaintiff asserts that this amendment "suspends the operation of state law" in reference to the acquisition of rights of way, insofar as "local contributions are concerned", whether taken by the Government directly or through state agencies, such as the Levee Board. However, it seems clear that whether this contention be correct or not, the provisions of the Federal Constitution above quoted required the Government to pay "just compensation" for any property which it took through the exercise of its own sovereignty, and that no act of Congress could relieve it of that responsibility. The matter comes down, therefore, to the questions of fact and law as to whether the right to destroy the timber existed under either the terms of the original right of way on which the levee stood, and was incidental thereto, or whether what the Levee Board did amounted to an appropriation within the meaning of the State law, vesting in it rights which it could in turn legally transfer to the Government. There is no contention that the right to destroy the timber existed under the original right of way so far as this court is able to ascertain.

█ Generally speaking, private ownership of property is still recognized and protected by the law of the land, and those who seek to take or to deprive the owners thereof for public purposes must follow scrupulously the law which permits it to be done. Any other course would lead to serious consequences. This brings us to the point as to whether what was done by the State, through the Levee Board, made it possible to convey an unencumbered title to the Government, authorizing it to take or destroy the timber of the plaintiff without paying for it; or the lesser right to pay not more than the assessed value of the property so taken, subject to the condition which, under the State Jurisprudence, makes it necessary that the owner allege and prove the property was assessed at its value as represented thereby for the preceding year, as a condition precedent to recovery of anything. This requires an analysis, first, of the State law, and secondly, of the facts to determine whether that law was complied with in what the Levee Board did.

This is what took place before the Government began destroying the timber:

Plaintiff acquired this timber through deeds, properly recorded, before the Government or Levee Board took any action looking to the enlargement of the levee or the destruction of the timber.

Act 188 of 1904, LSA–R.S. 9:1103, provides:

"That standing timber shall remain an immovable, and be subject to all the laws of the State on the subject of immovables, even when separated in ownership from the land on which it stands, provided that nothing in this act shall be construed as altering, affecting or modifying existing laws relative to the assessment and taxation of such timber".

On May 16, 1928, the Fifth District Levee Board passed a resolution authorizing its officers and members to sign "the pledge or guarantee to the United States Government" to carry out the provisions of the Flood Control Act of May 15, 1928, 33 U.S.C.A. § 702a et seq., which obligated said Board, among other things, to "(c) provide without cost to the United States all rights of way for levee foundations and levees on the main stem of the Mississippi River" (Exhibit G-1). Thereafter, on June 15, 1929, in carrying out the obligations so assumed, the Levee Board passed another resolution, from which the following is quoted:

"The *Fifth Louisiana* Levee District by its duly qualified and lawful officials whose signatures are affixed hereto, for and in consideration of the benefits

and advantages expected to accrue to said district in particular and to the lands and other property in the alluvial valley of the Mississippi River in general from the carrying out of the plans provided for and made possible by the said Act of Congress approved May 15, 1928, known as the Flood Control Act, hereby agrees and pledges that it will, in general, truly and faithfully perform and execute all obligations and requirements imposed upon said district by any part or parts of said Act of Congress; and specifically that it will trully and faithfully perform and execute requirements (a) and (c), of Section 3 of said Act, namely that said district will:

\*  \*  \*  \*  \*  \*

"(c) Provide without cost to the United States all rights of way for levee foundations and levees on the main stem of the Mississippi River."

With respect to the work undertaken out of which these suits arise, the following communications between the Board and the Army Engineers took place:

On May 19, 1947, the Federal District Engineers wrote the president of the Levee Board:

"We are in receipt of a letter from Colonel John R. Hardin, District Engineer, New Orleans District, U. S. Engineers dated May 9 together with project plans of the proposed enlargement of the Brabston and Ashland Levee south of Vidalia, Louisiana.

"We have examined these plans and it is recommended that your Board concur with Colonel Hardin in enlarging these two low sections of levee in accordance with plans, provided that provisions are made for draining existing gravel road on crown of old levee.";

and on June 10th of the same year, the Engineers addressed another letter to the Levee Board, enclosing plans of the proposed enlargement of the Ashland Levee, and stating:

"It is desired that this District be furnished a formal statement by your Board that rights-of-way are available for the construction of the enlargement and granting the United States a right of entry to prosecute the work. This statement may be in the form of a letter signed by the President of the Board.

"You are advised that Brabston Levee, Items A-E, was advertised for construction 6 June; bids to be opened 20 June. Ashland Levee Items A-E will be advertised later this month."

June 12, 1947, the President of the Levee Board replied:

"This is to acknowledge receipt of your letter of June 10th, with the enclosed drawings for Item M-343-R, A-E, Brabston Levee Enlargement and Item M-337-R, A-E, Ashland Levee Enlargement and requesting that you be furnished the formal statement by this Board that rights-of-way are available for the construction and enlargement and granting the United States a right of entry to prosecute the work.

"The Board of Commissioners of the Fifth Louisiana Levee District hereby is glad to comply with your request and render you any assistance possible."

Then follows the crucial document in this case, which reads:

" 'Due to the fact that in emergency levee work delays are at times caused by the necessity of waiting for rights-of-ways until the next regular Board meeting, Commissioner Yerger offered the motion, seconded by Commissioner Guenard, and unanimously approved, that the President of the Board, Mr. A. T. Shields, be and he is hereby authorthorized and empowered on behalf of the Board of Commissioners, Fifth Louisiana Levee District, to grant rights of way where the need is immediate, the proper right-of-way resolutions to be passed in the regular manner at the following Board meeting.' "

This resolution was passed, according to the certificate of the Secretary of the Levee Board, on September 12, 1945, some two years prior to the beginning of the work in this case.

There is next quoted (G-7) from the minutes of the Levee Board, the following:

"A letter dated June 10, 1947 was read to the Board from Lt. Colonel Alvin R. Moore, Executive Officer of the New Orleans District, requesting a formal statement from this Board that rights-of-way are available for the construction of the Brabston Levee Enlargement, Item M-343-R, A-E, and the Ashland, Levee Enlargement, Item M-337-R. This request was complied with by letter signed by the President of this Board and dated June 12, 1947, which letter was read to the Board."

The certificate of the Secretary to this document states:

"That the foregoing is a true * * excerpt from the official records of the minutes of a meeting on July 9, 1947, as the same appears of record on page 222 of the Minute Records of said Board for the period January 22, 1942, through December 1, 1948".

On July 15, 1947, the Engineers wrote the Board as follows:

"This is to advise that notice to proceed with construction of Item M-343-R, A, B and C, Brabston Levee, Lower Tensas Levee District, Concordia Parish, Louisiana, was issued 10 July 1947 to H. B. Blanks Construction Company, Ferriday, Louisiana, and on Items D and E to Pioneer Contracting Co., Inc., 453 Plum Ave., Memphis, Tenn., on 11 July 1947.

"According to the terms of the contracts, work must commence under each contract within twenty (20) calendar days after date of receipt of notice to proceed."

It thus appears that a period of approximately two months (May 19th to July 15th) elapsed between the writing of G-3 by the Engineers informing the Board that it had been decided to enlarge the levees and requesting that it "concur * * * in enlarging these two low sections of levees in accordance with plans * * *", although the plans were not actually sent to the Board until June 10th, almost a month

later. However, the latter, it is assumed, was familiar with the location of Brabston and Ashland Levees mentioned in the first letter of May 19th preceding, and the necessity for clearing the adjacent lands for that purpose. Counting from June 10, 1947, when notice was given to the contractors to proceed, the latter had an additional period of twenty days within which to begin work, so that if either the Levee Board or the Engineers had given complainant notice promptly that the work would be done, it no doubt could have come in and removed the timber before it was destroyed. However, the evidence shows that the first knowledge complainant had of the matter was after contractors had begun the destruction.

The Board first requested of the Assessor a list of the property owners in the area where the levees were to be enlarged on June 20, 1947 (G-10). No reply was received, and on July 18, approximately a month later, a second letter was sent to the Assessor, reminding him that he had not replied to the first (G-11). Finally, under date of July 31, the Assessor, according to copy of his letter, sent "the list of property owners" to the Board. Plaintiff was not included for the reason that its timber acquired from Birdwell September 21, 1946, nor that reserved in the sale to Orrin James on November 15, 1946, had been assessed for that year. However, the owners of the land on which the timber was situated, R. B. Sharp of Sharp and Stricker, and James were so assessed and listed.

Eventually, under date of October 10, 1947, the President of the Levee Board wrote Sharp and Stricker as follows:

"Our inspector, Mr. D. L. Nelson, advises us that you have been previously notified by him that the enlargement work on the Brabston and Ashland levees in Concordia Parish, Louisiana, would soon begin.

"As you of course know, the work on the Brabston enlargement has already started. We are today in receipt of a letter from the Corps of Engineers, New Orleans District, advising us that notice to proceed with work on Items N-337-R-D&E, Ashland Levee in Con-

cordia Parish, Louisiana, was issued October 7, 1947, to the Atlas Construction Company, Waxahachie, Texas.

"According to the terms of the contract, work must commence within twenty calendar days after the date of receipt by the contractor of notice to proceed.

"We respectfully request that any buildings, timber or other obstacles which might be within the rights-of-way be removed prior to the time that the contractor begins work.

"For any further detailed information which you might desire I would advise that you contact Mr. F. N. Geddes, Regional Engineer, U. S. Engineers, St. Joseph, Louisiana."

Notice was given "verbally" by D. L. Nelson, an inspector for the Board, to Sharp and James, evidently after receipt of the list of assessed property owners sent with a letter of the Assessor dated July 31, 1947.

The plaintiff was the successor to the Natchez Veneer Company, and acquired the timber on Roseland Plantation with the other property in April, 1943. Some two months later, they also purchased the land in fee because the time for cutting the timber was about to expire. Hence, at the time of selling the land and retaining the timber, plaintiff's title to both land and timber had been merged in a single owner and was subject to assessment as a part of the land.

The above quoted Section 6 of Article XVI of the State Constitution states that the means therein provided for paying for property "used or destroyed for levees or levee drainage purposes * * * *shall not prevent the appropriation of said property before payment"*, and therefore constitutes an exception to the general provisions in Sec. 2 of art. I of the same Constitution that "private property shall not be taken or damaged except for public purposes and *after just and adequate compensation is paid"*.

What is meant by the expression "*appropriation* of said property before payment" as expressed in Sec. 6 of art. XVI of the State Constitution? In the first place, it was necessary, if there was to be any deviation from the requirement of prior payment as provided in Sec. 2 of art. I, it had to be as was done in said Sec. 6, art. XVI of the Constitution itself, in order to have equal dignity. This, however, did not absolve the Levee Board from the necessity of following the provisions of the State law as to the manner of taking, appropriating or expropriating private property. These provisions are to be found in Tit. 19, Secs. 1 through 13, of the LSA–Revised Statutes of 1950, as copied from the General Statutes of the State. Section 2 of that title provides:

"Where a price cannot be agreed upon with the owner, any of the following may expropriate needed property:

"(1) The state or its political corporations or *subdivisions created for the purpose of exercising any state governmental powers;*" (emphasis by the writer).

Section 4 declares that such cases shall be tried "without jury"; and Sections 5 through 13 provide, in detail, for notices and service upon the property owners and others, such as how the action shall be put at issue and tried, "in or out of term and with dispatch"; the payment into the Court of the award and its distribution as between the owner, mortgagee or lien creditors. Thus due process or notice, with the opportunity to be heard, are fully preserved.

In this case, the statutory law was not followed, but the Levee Board purported to convey to the United States the right to "use or destroy" private property without any notice or formal procedure whatever, other than the letters of communication and the resolutions passed some years before and quoted above.

As indicated above, there were and are serious questions as to whether the title to this timber was in condition, by segregation from the land, to be subject to assessment for the preceding year, 1946, since the creating of a separate title thereto did not take place until late in September and November of that year, after the time when, as a matter of common knowledge, assess-

ment rolls are usually made up, if not actually filed. There is also involved the question of whether this was batture, and whether the language of Sec. 6 of art. XVI of the Constitution "Lands and improvements" include timber separately owned, which, by statutory law, is governed by all the rules applicable to real estate when they are owned separately. (See Act 188 of 1904 quoted above). The decisions holding that growing crops are part of the lands, so declared by the LSA–Civil Code, art. 465, were in cases where the realty was also owned by the same persons.

■ It is not believed that either the Government or the Levee Board could thus proceed to destroy this timber in the manner which was done, and the course followed can be treated in no other light than a civil trespass, to which both were a party. 63 C.J. Sec. 63, page 923, Verbo Trespass, Sec. 47. The Government, in not having acquired the right to use or destroy the timber as contemplated by the State law, is not relieved from the positive provisions of the United States Constitution declaring that private property shall not be taken without just compensation.

If the Levee Board was of the view that, for the reasons it now urges, the plaintiff was not entitled to be paid for this timber, or the owner of the soil for so much thereof as was needed to enlarge the levee, it was its duty, after notice to the owners and if unable to agree as to the prices or that the property should not be paid for, under existing laws, to submit the matter to the court in the manner provided by the State statute and to ask for an adjudication accordingly. Neither it nor the Government could decide these issues themselves without any opportunity to the plaintiff to be heard. Such a course cannot be approved.

Since the Government had no valid title or legal right to destroy the timber, its liability arises under the rule of implied contract where private property is taken for public purposes such as levees, which binds it to pay an adequate value for the timber. This value, it is believed, is reasonably established at the sum of $17 per thousand feet for merchantable timber, and $12 for

that under eighteen inches in diameter and above twelve inches, and, in turn, the defendant, the United States is entitled to recover on the same basis over against the Levee Board since it was obligated to furnish the rights of way and whatever else was necessary for the enlargement of the levee for that purpose.

If the parties cannot agree upon the board measure to be paid for under this ruling, then this court will undertake to calculate it from the record, but in view of the press of other matters, an opportunity to fix the total amount due by agreement will be allowed.