GENERAL BOX CO. *v.* UNITED STATES.

No. 383.   Argued March 28, 1956.—Decided May 7, 1956.

*Edward Donald Moseley* and *Ross R. Barnett* argued the cause for petitioner.   On the brief with *Mr. Moseley* was *Fred G. Benton.*   *P. Z. Jones* and *Carl A. Chadwick* entered an appearance for petitioner.

*S. Billingsley Hill* argued the cause for the United States.   With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Morton, John R. Benney* and *Roger P. Marquis.*

*Fred S. LeBlanc,* Attorney General, and *John L. Madden,* Assistant Attorney General, filed a brief for the State of Louisiana, as *amicus curiae,* urging affirmance.

Mr. Justice Reed delivered the opinion of the Court.

General Box Company, an owner of trees of commercial value along the main stem of the Mississippi River in Louisiana, brought this action to recover from the United States the value of its timber destroyed by the Government through its duly authorized agent, a contractor.

The trees grew upon land belonging to others and located between the low- and high-water mark of the river. Such land is known in Louisiana as "batture."[1] Since colonial days batture has been subject to a servitude of the State for use in the construction and maintenance of levees. It may be used for these purposes without the payment of compensation to the owner.[2] The United States cooperates with Louisiana in the containment of the Mississippi within levees.[3] To carry out federal plans in the area in controversy, the United States requires,[4] and Louisiana agrees to furnish,[5] the necessary rights-of-way "without cost" for the construction of levees. Louisiana has given general authority to its Levee Boards to donate to the United States the necessary "lands, movable

---

[1] Batture is "that part of the river bed which is uncovered at the time of low water, but is covered annually at the time of ordinary high water." (Italics omitted.) *Boyce Cottonseed Oil Mfg. Co.* v. *Board of Comm'rs,* 160 La. 727, 734, 107 So. 506, 508.

[2] See *Wolfe* v. *Hurley,* 46 F. 2d 515, affirmed, 283 U. S. 801; *Dickson* v. *Board of Comm'rs,* 210 La. 121, 26 So. 2d 474; *Pruyn* v. *Nelson Bros.,* 180 La. 760, 157 So. 585; *Mayer* v. *Board of Comm'rs,* 177 La. 1119, 150 So. 295; *Peart* v. *Meeker,* 45 La. Ann. 421, 12 So. 490; La. Civil Code, 1945, Art. 665; La. Const., 1921, Art. XVI, § 6.

[3] Federal Flood Control Act of May 15, 1928, 45 Stat. 534, as amended, 33 U. S. C. § 702a *et seq.*

[4] 33 U. S. C. § 702c.

[5] La. Const., 1921, Art. XVI, § 5. And see note 6, *infra.*

or immovable property, rights of way, or servitudes" for flood control use.[6] The Fifth Louisiana Levee District, the one here involved, agreed to meet the requirements of the Federal Flood Control Act.[7]

The location of the operation giving rise to this action was at the Brabston Levee in the Fifth Louisiana Levee District. The first step taken by the United States to obtain the permission of the State to use the State's servitude in the batture here in issue was the filing of the federal plans with the State District Engineer. The plans were approved by the Engineer and the local Levee Board was so notified.[8] On June 10, 1947, the Levee Board received the drawings from the United States District Engineer with the following request for authority:

> "It is desired that this District be furnished a formal statement by your Board that rights-of-way are available for the construction of the enlargement and granting the United States a right of entry to prosecute the work. This statement may be in the form of a letter signed by the President of the Board."

[6] Act No. 75, Acts of 1940, La. Rev. Stat., 1950, 52:2. And see Act No. 76, Acts of 1938, La. Gen. Stat., 1939, § 6869.3.

[7] The Board of Commissioners of the Fifth Louisiana Levee District adopted general resolutions in 1928 and 1929, in consideration of the benefits of the Flood Control Act, agreeing to "[p]rovide without cost to the United States all rights of way for levee foundations and levees on the main stem of the Mississippi River."

[8] On May 19, 1947, the State District Engineer wrote to the President of the Levee Board as follows:

"We are in receipt of a letter from Colonel John R. Hardin, District Engineer, New Orleans District, U. S. Engineers, dated May 9 together with project plans of the proposed enlargement of the Brabston and Ashland Levees south of Vidalia, Louisiana.

"We have examined these plans and it is recommended that your Board concur with Colonel Hardin in enlarging these two low sections of levee in accordance with plans, provided that provisions are made for draining existing gravel road on crown of old levee."

Under a standing resolution, adopted September 12, 1945, the President of the Board was empowered to honor applications for such authority.[9] On June 12, 1947, the Board President responded to the United States Engineer, quoting the words of the request and adding:

"The Board of Commissioners of the Fifth Louisiana Levee District hereby is glad to comply with your request and render you any assistance possible."

On July 9 that letter was spread upon the minutes of the Board. We accept that, as did the Court of Appeals, as a ratification by the Board of the act of its President. On July 10 the contractors who were to execute the levee work were authorized by the United States to proceed within 20 days, and the clearing of the batture was commenced on July 22.

No notice was given to petitioner of the intention to bulldoze its trees off the batture. On September 12 the petitioner discovered that the trees were being destroyed, and an objection was promptly made. The contractor, however, refused to halt its operations, relying upon its contract with the Government.

Petitioner brought two actions in the District Court under the Tucker Act, 28 U. S. C. § 1346 (a)(2), to recover the value of the destroyed timber.[10] The suits

---

[9] "Due to the fact that in emergency levee work delays are at times caused by the necessity of waiting for rights-of-ways until the next regular Board meeting, Commissioner Yerger offered the motion, seconded by Commissioner Guenard, and unanimously approved, that the President of the Board, Mr. A. T. Shields, be and he is hereby authorized and empowered on behalf of the Board of Commissioners, Fifth Louisiana Levee District, to grant rights of way where the need is immediate, the proper right-of-way resolutions to be passed in the regular manner at the following Board meeting."

[10] Although alternative claims were made under the Federal Tort Claims Act, 28 U. S. C. § 1346 (b), they were abandoned while the cases were still in the District Court. See 107 F. Supp. 981.

were consolidated for trial, and ultimately a single judgment was entered against the United States in the amount of $10,801 plus interest.[11]   Both the United States and petitioner took appeals to the Court of Appeals, the former on the merits and the latter from so much of the judgment as fixed the interest at 4% from date of judgment. The Court of Appeals reversed, holding the United States to be free from liability.[12]   We granted certiorari to examine the liability of the United States for proceeding to clear this land without notice to petitioner, the owner of the trees, and thus without granting petitioner a reasonable opportunity to salvage the timber.[13]

One of the defenses relied upon by the United States throughout this litigation is a claim that it is not liable to petitioner for the timber losses because it received rights-of-way on the land involved from the Levee Board, and that the Levee Board legally appropriated those rights-of-way without compensation under its riparian servitude.   Petitioner concedes that under the civil law of Louisiana the property on which its trees were standing, being batture, is subject to a riparian servitude for use by the State of Louisiana in constructing and repairing levees, and that historically the owner of such

---

[11] 119 F. Supp. 749.   See also prior opinions of the District Court in this case at 94 F. Supp. 441 and 107 F. Supp. 981.

[12] 224 F. 2d 7.

[13] 350 U. S. 882.

The Board of Commissioners of the Fifth Levee District was made a third party defendant in the District Court pursuant to a motion of the United States.   It was and is the Government's position that, if it is liable to petitioner, it is entitled to judgment over against the Board.   The District Court ruled that the United States was liable and that it, and not the Levee Board, must pay the award.   119 F. Supp. 749.   The Court of Appeals did not reach the question of the liability of the Board over to the United States since that court held that the United States was not liable at all.   In view of our disposition of the case, we likewise need not reach that question.

property has been required to permit State use without compensation of such part thereof as might be needed for levee purposes. And it is not denied that the timber on this land, as well as the land itself, is subject to the exercise of the servitude for levee purposes.[14]

Petitioner in effect does claim, however, that the State did not effectively exercise the riparian servitude for the reason that the appropriation here was arbitrary and therefore beyond the power of the State. This contention is based upon the fact that no notice of the proposed destruction was given to petitioner. It is argued that under Louisiana law, which of course defines the bounds of the riparian servitude, the power possessed by the State by reason of the servitude is not an unlimited and arbitrary power;[15] that it would be arbitrary, oppressive and unjust to exercise the State's rights under the servitude in the circumstances of this case without prior notice to petitioner; that therefore the attempt by the State to exercise the servitude without such notice was ineffective to cause an appropriation of the timber pursuant to the

---

[14] Cf. *Lacour* v. *Red River, A. & B. B. Levee Dist.*, 158 La. 737, 104 So. 636; La. Const., 1921, Art. XVI, § 6; Louisiana Civil Code, 1945, Art. 665.

Petitioner suggests that the destruction of the timber in this case was not for "levee purposes," but rather was undertaken merely for the purpose of saving the Government money. This contention is based on the fact that the only reason the trees were destroyed was because the contractors were permitted under their contract to bulldoze the standing trees—a less expensive method for clearing land than removing the stumps of cut timber. But in order for the use of the timber to be for "levee purposes," it is not necessary that the trees themselves be employed in the construction or improvement of the levee. It is sufficient if the trees were destroyed in connection with a levee project. Cf. *Lacour* v. *Red River, A. & B. B. Levee Dist.*, *supra*; La. Const., 1921, Art. XVI, § 6.

[15] Petitioner relies on language in *Peart* v. *Meeker*, 45 La. Ann. 421, 426, 12 So. 490, 492; and in *Pruyn* v. *Nelson Bros.*, 180 La. 760, 768, 157 So. 585, 587.

servitude.   If Louisiana could not exercise its rights under the servitude without first giving notice to petitioner, the timber here involved was never successfully taken by the State free of an obligation to compensate for the taking.[16] It would follow that the United States received no rights from the Levee Board permitting destruction of the trees by it free of that obligation.   The Court of Appeals held, based upon its analysis of Louisiana law, that prior notice to petitioner was not a prerequisite to an appropriation of its timber for levee purposes.   We ordinarily accept the determinations of the Courts of Appeals on questions of local law, and we do so here.   *Ragan* v. *Merchants Transfer Co.,* 337 U. S. 530, 534; *Huddleston* v. *Dwyer,* 322 U. S. 232, 237.

The Louisiana courts have made no pronouncement which directly controls this question.   But see *Board of Comm'rs* v. *Trouille,* 212 La. 152, 31 So. 2d 700.   The Supreme Court of Louisiana has, however, as recently as 1946, reviewed the long history of the riparian servitude. *Dickson* v. *Board of Comm'rs,* 210 La. 121, 26 So. 2d 474. In that case it was noted that:

> ". . . while in all of the remaining states of the Union lands necessary for levee purposes can only be used after expropriation and proper indemnification, in Louisiana the state has the right to act first, i. e., the authority to appropriate such land to a use to which it is subject under its very title, and talk later.
>
> .     .     .     .     .
>
> ". . . And however unfair it may seem to the owners of this type of land they are without right to complain because their acquisition of such land was subject by law to this ancient servitude and the

---

[16] La. Const., 1921, Art. I, § 2.

> private mischief must be endured rather than the public inconvenience or calamity." 210 La., at 132, 136, 26 So. 2d, at 478, 479.

The court further stated that the rights of the State under the servitude can be exercised in the way found to be "most expeditious from an engineering, economical, and practical standpoint." 210 La., at 138, 26 So. 2d, at 480; *Board of Comm'rs* v. *Franklin,* 219 La. 859, 866, 54 So. 2d 125, 127–128. The levee enlargement plan here called for bulldozing standing timber for reasons of economy— that operation admittedly being a less expensive method for clearing land than removing the stumps of cut timber. The servitude was developed so as to insure "that the shores of navigable rivers and streams in this state would always be kept free for the public for levee . . . purposes." 210 La., at 131–132, 26 So. 2d, at 478. This historical background makes clear that the rights of the State in property subject to the servitude are very broad. By law, and for the good of all, lands were made available to the State for levee purposes in as convenient a manner to the State as was necessary for the public welfare, and with little regard for the severity of the obligations imposed on the individual property owner. Nothing in the development of the servitude indicates that, before the State can exercise its obviously comprehensive rights, it must provide an opportunity to remove timber from batture.

Since, as we hold, petitioner's property was effectively appropriated by state authorities pursuant to the servitude, the United States cannot be liable to petitioner for the value of the property. The State, as owner of the servitude, legally could have destroyed the timber without prior notice and without any opportunity for mitigation of losses, and yet be free of liability to petitioner. The destruction, it seems to us, was consistent with the

rights of the State under the servitude. Rather than undertake the levee project itself, Louisiana, through one of its agencies, donated its rights as against petitioner's timber to the United States. The United States, as donee of those rights, could exercise them to their full extent without incurring liability, just as its donor could have done.

The petitioner sought compensation for the destruction of the trees based upon a claim that the "destruction of said timber was [a] taking . . . within the meaning of the Fifth Amendment to the Federal Constitution." But this property was not taken by the United States in the exercise of its power of eminent domain. In effect, the timber was "owned" by Louisiana for levee purposes, and the United States succeeded to that "ownership" by "conveyance." Louisiana furnished its batture as required by the law of both the United States and Louisiana for use in protecting the property in the State from floods. Petitioner did not assert in its complaints or in its question presented on petition for certiorari that the destruction violated the Due Process Clause of the Fifth Amendment.[17]

*Affirmed.*

MR. JUSTICE FRANKFURTER, concurring.

The conflicting views between two members and the rest of this Court on the law of Louisiana relevant to the issue in this case prove once more what a precarious business it is for us to adjudicate a federal issue dependent on what the Court finds to be state law, when the highest court of a State has not given us authoritative

---

[17] Cf. *Eldridge* v. *Trezevant*, 160 U. S. 452; *Mayor of Vidalia* v. *McNeely*, 274 U. S. 676; *Wolfe* v. *Hurley*, 46 F. 2d 515, aff'd, 283 U. S. 801; *Board of Comm'rs* v. *Franklin*, 219 La. 859, 54 So. 2d 125, appeal dismissed, 342 U. S. 844, on authority of *Eldridge* v. *Trezevant*, *supra*, and *Wolfe* v. *Hurley*, *supra*.

guidance regarding its law. In like situations I have, from time to time, suggested that legal procedure is not without resources for enabling us to found our decision securely on state law. See, *e. g.*, *Propper* v. *Clark,* 337 U. S. 472, 493 (dissenting in part). By means of the declaratory judgment (it is available in Louisiana, La. Rev. Stat., 1950, 13:4231 *et seq.*) or otherwise, it ought to be possible to suspend definitive judgment on the federal issue until a pronouncement can be had from the state court on controlling state law. For myself I am prepared so to proceed here. In default of it, I concur in the opinion and judgment of the Court.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE HARLAN concurs, dissenting.

We have at the root of this case a question of Louisiana law—whether the timber grown on batture is "property" and, if so, whether it may be confiscated without any opportunity to the owner to salvage or remove it. The timber concededly is of value. It is bought and sold and plays a significant role in the conduct of commercial enterprises.[1] The Court apparently concedes that the timber is "property" within the meaning of the Fifth Amendment. Otherwise the Court would not reserve decision on whether the Due Process Clause of the Fifth Amendment has been violated. If the timber is "property" so far as the Due Process Clause is concerned, it

---

[1] The timber which was destroyed was on two tracts of land. In 1946 petitioner purchased the entire fee of one tract for $30,000 and resold it for $15,000 two months later, reserving the timber rights for 20 years. In 1947 petitioner purchased the timber rights on the second tract for a period of 10 years, paying $36,000 for these rights. The trial judge found that the total value of the timber destroyed was $10,801, and he entered a judgment for that amount plus interest.

would seem to be "property" within the meaning of the Just Compensation Clause of the same Amendment. The question then comes down to whether the timber may be confiscated without any notice to the owner. If Louisiana could not confiscate the timber, then the United States certainly may not. For the United States has succeeded to such ownership as Louisiana has.

Concededly this land between low- and high-water mark—the batture—may be used as the State chooses for the construction and maintenance of levees without compensation to anyone. But we have it on excellent authority that, under Louisiana law, private property on the batture may not be confiscated without reasonable opportunity of the owner to salvage it. The authority is the eminent district judge who decided this case, Hon. Ben C. Dawkins. Judge Dawkins, who was appointed to the federal bench in 1924, was a Louisiana lawyer of distinction. He not only practiced law in that State. From 1912–1918 he was a state district judge and from 1918–1924 an associate justice of Louisiana's Supreme Court. He was a member of the Louisiana Constitutional Convention in 1921. Indeed, Judge Dawkins was the author of Art. XVI, § 6 of the Louisiana Constitution, which provides that batture may be taken for levee purposes without compensation. See *General Box Co.* v. *United States,* 107 F. Supp. 981, 983. Judge Dawkins held that, under Louisiana law, notice to the owner of the timber was necessary. There is no square holding of the Louisiana courts on the point. The problem lies in the penumbra of Louisiana law, making all the more difficult a prediction as to what the Louisiana courts would hold. On questions far less complicated or obscure than this one, we have deferred to decisions of the lower federal judge on the local law of his own State. See *MacGregor* v. *State Mutual Co.,* 315 U. S. 280, 281; *Huddleston* v.

*Dwyer*, 322 U. S. 232, 237; *Hillsborough* v. *Cromwell*, 326 U. S. 620, 630; *Steele* v. *General Mills*, 329 U. S. 433, 439; *Ragan* v. *Merchants Transfer Co.*, 337 U. S. 530, 534; *Bernhardt* v. *Polygraphic Co.*, 350 U. S. 198, 204.

Judge Dawkins relied on *Pruyn* v. *Nelson Bros.*, 180 La. 760, 768, 157 So. 585, 587, where the Louisiana Supreme Court in reviewing the servitude governing batture said:

> "This servitude is limited only by the reasonableness of its use, and the administrative officers of the state of Louisiana are charged with determining that limit, subject to review by the courts only when oppression or injustice is shown and proved."

Judge Dawkins ruled that what was done in this case amounted to "oppression or injustice" within the meaning of the *Pruyn* case. See 119 F. Supp. 749, 751. I would defer to his judgment. We are dealing with nuances of local law that only one trained in it can evaluate.[2] The difficulty is compounded for common-law lawyers. For this is civil law that has overtones from distinct languages and history.

Mr. Justice Holmes wrote, in a case from Puerto Rico, of the special deference due local judges on rulings upon matters under the civil law. *Diaz* v. *Gonzalez*, 261 U. S. 102, 105–106:

> "This is especially true in dealing with the decisions of a Court inheriting and brought up in a different system from that which prevails here. When we contemplate such a system from the outside it seems like a wall of stone, every part even with all the others, except so far as our own local education may lead us to see subordinations to which we are accustomed. But to one brought up within it, varying

---

[2] None of the judges either of the Circuit Court or of this Court who voted to reverse Judge Dawkins is from the Louisiana Bar.

emphasis, tacit assumptions, unwritten practices, a thousand influences gained only from life, may give to the different parts wholly new values that logic and grammar never could have got from the books."

I cannot read the Louisiana decisions without feeling that Judge Dawkins was right on the law.[3] The servitude governing batture is dominant but not absolute. Private property must give way before it—but only to the extent that the public welfare demands. As stated in *Peart* v. *Meeker,* 45 La. Ann. 421, 426, 12 So. 490, 492:

"It is undoubtedly the duty of public officers charged by the State with the execution of its police power to make no greater sacrifice of private rights than the public welfare demands. In several cases this court has said that the power so conferred is not arbitrary, and that the citizen is not without remedy to subject it to judicial control in proper cases."

---

[3] No Louisiana cases have been found in which notice was not given in time to allow property to be salvaged from the batture. In *Board of Levee Commissioners* v. *Kelly,* 225 La. 411, 73 So. 2d 299, 30 days notice was given to batture dwellers to remove their structures and possessions. And see *Board of Commissioners* v. *Franklin,* 219 La. 859, 863–864, 54 So. 2d 125, 127–128; *Board of Commissioners* v. *Trouille,* 212 La. 152, 157–158, 31 So. 2d 700, 701–702; *Peart* v. *Meeker,* 45 La. Ann. 421, 424, 12 So. 490, 491, in each of which notice was given.

In the present case, written notice was sent to the owners after the clearing in question was completed. In this notice, the owners were warned that work would begin on another levee. The letter-notice said, "We respectfully request that any buildings, timber or other obstacles which might be within the rights-of-way be removed prior to the time that the contractor begins work."

The Court quotes from *Dickson* v. *Board of Comm'rs,* 210 La. 121, 26 So. 2d 474, to the effect that the State may "appropriate such land . . . and talk later." But the *Dickson* case involved consequential damages to riparian land resulting from a change in a river channel, not a taking of land or other property.

If the State destroyed a home or other structure in the batture without notice to the owner, I think Louisiana would grant a remedy—provided of course the State was not confronted with an emergency and did not have to act with speed. But, where there is time to give notice, it is "oppressive" not to do so, as Judge Dawkins said.

Even if I am mistaken in this view of the Louisiana law, I would hold as a matter of federal law that the United States cannot rely on the state-created servitude to justify its own action, which borders on the wanton destruction of the property interests of the private owners of the timber. For all that appears, General Box was prepared to remove the timber without additional expense or delay to the United States.

The requirement of notice is deeply engrained in our system of jurisprudence. *Mullane* v. *Central Hanover Bank,* 339 U. S. 306; *Covey* v. *Town of Somers,* decided this day, *ante,* p. 141. The taking of property without notice where notice can reasonably be given, and with the result that the owner is deprived of the chance to salvage the property, is sheer confiscation.