**Dr. John I. REDDIX, Appellant,**

v.

**Mrs. May LUCKY, Registrar of Voters, Ouachita Parish, Appellee.**

**No. 16688.**

United States Court of Appeals Fifth Circuit.

Feb. 25, 1958.

Rehearing Denied March 28, 1958.

James Sharp, Jr., Monroe, La., for appellant.

Fred Fudickar, Jr., Albin P. Lassiter, Monroe, La., George M. Ponder, First Asst. Atty. Gen., Jack P. F. Gremillion, Atty. Gen., for respondent.

Before BORAH, TUTTLE, and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a summary judgment in favor of the defendant, the Registrar of Voters of Ouachita Parish, Louisiana, in an action for damages and for an injunction under the Constitution and the Civil Rights Statutes of the United States forbidding the abridgment of voting rights on account of race or color.

The complaint, filed by the appellant on behalf of himself and all other Negro voters of Ouachita Parish, which had been summarily challenged in April and May, 1956, construed most strongly in favor of the pleader, as it must be, makes substantially the following allegations:

The defendant was the duly appointed registrar of voters, acting officially as such; plaintiff was a Negro citizen and registered voter of the Parish; on April 26, 1956, plaintiff's right to remain on the rolls of voters was challenged,[1] as was

1. Under the Louisiana Statutes there are two provisions under which a challenge of an extremely summary nature may be made as to a registered voter's qualifications. Title 18, Section 132, LSA-Revised Statutes of Louisiana, provides as follows:

"Whenever the registrar has reason to believe that any name upon the books of registration has been illegally or fraudulently placed therein, or that any person has lost the right to remain thereon, he shall immediately notify the person by mail, at his address appearing upon the precinct register, of the alleged irregularity in registration, sending with the notification a printed citation requiring the person to appear within ten days from the mailing of the notice and citation, which date shall be stated in the citation, to show cause why his name should not be erased from the precinct register. The registrar, as soon as at least six names have accumulated, or in any event within not more than five days after mailing the notification, shall publish a notice segregating such names by ward and precinct, and requiring the registrants to appear in his office and prove the correctness of their registration. The publication shall appear in the official journal, and at the expense of the parish or municipality, as the case may be, for two consecutive days, except where no daily paper is published, in which latter case, one publication shall be sufficient, and if no paper is published in the parish, one publication in a newspaper of general circulation therein, provided no publication shall be made on a Sunday. The publication shall require the registrants to appear within three days of the last publication and prove the correctness of their registration. If the registrants fail to appear within three days from the date of last publication,

the right of 3,000 other Negroes during the period April 1 to May 12, 1956; plaintiff and 2500 of the other Negroes were disqualified and struck from the rolls as the result of this "purge of voters," all in violation of their constitutional rights; the challenge was conducted wholly on the basis of race; the defendant mailed more challenges than her office could accommodate and hundreds of Negroes never got into her office to answer the challenge within the short period allowed, although they tried to do so;[2] the requirements of Section 133 as to reasonable investigation was not complied with; defendant did not give proper publication and notice in the newspaper, as required in Section 132; the last publication was on May 11th and the defendant closed her office on May 12th and refused to process any more Negroes thereafter; plaintiff went to the defendant's office on May 15th and offered to answer the challenge, but was refused by her on the basis that the books were closed;[3] "because of the number of persons around her office daily trying to prove the correctness of their registration, plaintiff could not get in the office before the above mentioned date, even though he tried many times." The complaint alleged that the defendant by such of the purging acts as are attributable to her has violated the constitutional rights of the plaintiff; that "she has abridged his privileges [sic] and immunities as a citizen of the United States and has denied him equal protection of the law as

or within ten days from the date of mailing of the notice, whichever date is later, the registrar shall at once cancel the names from the precinct register and make a note thereon of the date of cancellation. However, if the registrants appear in person within the time aforesaid, and proof is submitted by them in the form of an affidavit signed and sworn to before the registrar or his deputy by three bona fide registered voters of the parish, that such persons are legally entitled to remain on the books of registration, their names shall remain as voters on the precinct register, unless ordered erased therefrom by order of court, as provided in this Part.

Section 133 provides for a challenge by others as follows:

"Upon an affidavit signed and sworn to in duplicate before and filed with the registrar or his deputy by any two bona fide registered voters of the parish, to the effect that after reasonable investigation and on information and belief certain persons are illegally registered, or have lost their right to vote in the precinct, ward, or parish in which they are registered by reason of removal or otherwise, the registrar shall immediately, or, in any event, within forty-eight hours, notify the registrants by mailing to them postage prepaid, at the addresses given in the precinct register, the duplicate copy of the affidavit, together with a printed citation requiring them to appear in person before the registrar or his deputy within ten days from date of the mailing of the duplicate affidavit and citation, which date shall be stated in the citation, and prove their right to remain on the regis-

tration rolls by affidavit of three bona fide registered voters in the form as provided in R.S. 18:132. The registrar shall immediately make a similar publication, as provided for in R.S. 18:132, and if the challenged registrants fail, within the same delays provided in that Section, to prove their right to remain on the rolls, as in that Section provided, the registrar shall erase their names from the precinct register."

2. The complaint alleges in paragraph 8 "that hundreds of Negroes were denied certification or the right to prove their right to remain on the rolls because their time had expired as provided by section 132 above quoted even though they had stood in line several days and could not get near the office because of the number of persons trying to answer their challenge [sic]; that the registrar closed her office on May 12, 1956 and refused to process any more Negroes even though hundreds stood around the office and continued to come back for the purpose of protecting their right to remain on the rolls; that for the several reasons in this paragraph stated plaintiff and twenty-five hundred (2500) other Negroes were disqualified to remain on the roll of registered voters by defendant."

3. The books had been closed for an impending Primary election, but this did not prevent the processing of challenges if the challenged voters appeared timely under the statutes. No new registration could be made until after the election.

provided by the fourteenth (14th) amendment to the Constitution of the United States; that defendant further denied him the right to vote in the City of Monroe, Mayor election on the 22nd day of May, 1956 and is presently denying him and the class he represent [sic] the above enumerated rights all because they are members of the Negro race and because his race has been in a precious [sic] condition of slavery, all in violation of the fifteenth (15) amendment of the Constitution of the United States."

The plaintiff sought a finding by the court that his removal from the rolls was illegal and void and an order setting aside this action, prayed an order restoring his name to the voters' list, prayed an injunction to prevent future challenges by or from defendant's office on the basis of race and prayed judgment for damages and for such other and further relief as warranted; he also prayed similar relief for the class which plaintiff purported to represent.

The plaintiff served written interrogatories on the defendant containing fifty-eight questions, many of which were relevant and germane to the allegations in the complaint.

The defendant filed a motion to dismiss for want of jurisdiction and for failure to state a claim on which relief could be granted. She also filed objections to the interrogatories on the general ground that they were so numerous and complex as to burden and harass the defendant; that they required defendant to make research and investigations and compile data from public records; that some called for opinions and the task was so hard that to answer them would place an undue burden and expense on the defendant.

The defendant then filed an affidavit which was countered by two affidavits by the plaintiff. *Without requiring an answer to any of the interrogatories,* and without ruling on the objections to them, the trial court treated the motion to dismiss together with the affidavit of defendant as a motion for summary judgment, as authorized in a proper case by Rule 12(b) F.R.C.P., 28 U.S.C.A. The court made detailed specific findings of fact, several of which were on disputed issues, and concluded that "from the pleadings and affidavits on file there are no genuine issues of material fact presented by this record," and entered a summary judgment for the defendant.

It is to be noted that the trial court did not grant the judgment on the ground that the complaint did not allege a claim on which relief could be granted or for want of jurisdiction. It may therefore be assumed that both the trial court and appellee, who does not attempt here to sustain the dismissal of the suit on any ground other than that relied on by the trial court, agree with the appellant that the complaint on its face alleges a claim which, if true, states a cause of action. Such an assumption seems clearly justified, for here the plaintiff charges that the defendant participated in a proceeding challenging him and 3,000 other Negroes as being illegally registered; that she failed to comply with the law as to such challenges and that she thus illegally struck the name of appellant and 2500 other Negroes from the voters' list solely on account of their race.

■ Whatever area of doubt remains as to the identification of other civil rights, there can be no doubt that the right to vote in any state election is guaranteed to every qualified citizen without regard to his race or color.

"Effect of race, color, or previous servitude.

"Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Amendment XV, Constitution of the United States, Section 1.

Congress has implemented the Fifteenth Amendment, as it is authorized to do by its second paragraph, by the adoption of the Act of May 31, 1870, c. 114, § 1, 16 Stat. 140, formerly codified at 8 U.S.C.A. § 31; now 42 U.S.C.A. § 1971. This statute provides:

"Race, color, or previous condition not to affect right to vote.

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding."

Congress has also provided sanctions to prevent the interference by state officials with this right to vote. 42 U.S.C.A. § 1983 provides:

"Civil action for deprivation of rights.

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

United States District Courts are expressly given jurisdiction over such actions by 28 U.S.C.A. § 1343, which provides in essential part:

"Civil rights.

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\*  \*  \*  \*  \*  \*

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

It seems clear, therefore, that this complaint alleging that the defendant, acting in her official capacity, participated in an illegal challenge of plaintiff's right to vote, and, by her own illegal failure to comply with the state law respecting the processing of such a challenge, caused his name to be improperly struck from the voters' rolls, all of which acts by her were done solely because he was a member of the Negro race and in violation of specified provisions of the Constitution, asserted a claim upon which relief could be granted both in damages and for injunction. Chapman v. King, 5 Cir., 154 F.2d 460, certiorari denied 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025. It is true that the complaint did not expressly state that the challenge as to him had been made by the defendant under the provisions of Section 132, supra, rather than upon the affidavit of two others under Section 133, supra. However, the complaint does explicitly assert that proper publication and notice in the newspaper and necessary delay was not allowed as provided by Section 132, and that the registrar closed her office on May 12 and "refused to process any more Negroes even though hundreds stood around the office and continued to come back for the purpose of protecting their rights to remain on the rolls;" and, of course, the alleged failure to comply with the publication requirements and the refusal to hear protests until the expiration of three days after last publication, both of which were alleged to be the cause of plaintiff being struck from the voters' rolls, were acts that only defendant could have done; these acts are alleged by plaintiff to have been done solely on account of plaintiff's race.

■ We conclude that the complaint stated a cause of action warranting relief.

We then come to the propriety of the court's action in entering a summary judgment for the defendant. Ordinarily

it is helpful for both the trial court and the reviewing court to have the fact issues drawn by the petition and responsive pleadings of the parties. Here no answer has been filed by the defendant, but she relied on a motion to dismiss for failure to allege a claim upon which relief could be granted; no facts were asserted in this pleading, but the defendant subsequently filed an affidavit in which she asserted numerous facts bearing on the allegations in the complaint. This was replied to by an affidavit by the plaintiff which categorically denied several relevant portions of the defendant's affidavit. It was at this stage of the proceeding that the trial court, without requiring the defendant to answer plaintiff's interrogatories and without passing on the objections to them, although formally requested by plaintiff to do so, held that "there are no genuine issues of material fact presented by this record."

At the then stage of the proceedings there were these issues of fact:

(1) Mrs. Lucky asserted that "two bona fide registered voters of Ouachita Parish, Louisiana executed an affidavit before her challenging the registration of Dr. J. I. Reddix." This is the procedure provided for in Section 133, supra. Dr. Reddix, in his affidavit stated: "Said challenge was not made in compliance with the law on the subject and that affidavit *was not executed before the defendant as alleged in her affidavit* even though the same appears to have been signed by John J. Feeback and Wesley Burdine";

(2) Mrs. Lucky swore that the affidavit was made on April 26; that "the original of said challenge *was immediately* mailed to Dr. Reddix" and "that notice of said challenge was *duly* published in the Monroe News Star *on May 10, 1956* and *May 11, 1956.*"

Dr. Reddix swore "The original of said challenge *was not immediately* mailed to affiant herein as required by law on the subject and *was not processed* in accord with the law on the subject in the daily newspaper."

Assuming that the state of the pleadings and affidavits authorized the court to consider the case as if on motion for summary judgment, yet it is here plain that the trial court erred in his conclusions when he did so.

We think it can hardly be gainsaid that before a registered voter can be summarily denied the right to vote because of some alleged disqualification the statutory procedures for disqualifying him must be strictly adhered to.[4] Here the affidavit of the defendant herself affirmatively shows that she did not follow the mandate of the statute. The court's finding of fact that the defendant caused notice of the challenge to be published "in accordance with L.S.A.–R.S. 18:132 and 133" is therefore without support.

Assuming the truth of her assertion that she mailed the notice *immediately* or within 48 hours as required by the statute, then obviously she did not publish the plaintiff's name "as soon as at least six names have accumulated, or in any event *within not more than five days after mailing the notification,*" because she swore that the publication took place on May 10 and May 11, at least five or six days after the time *required* by the statute. All normal rules for the construction of statutes aside, it does not appeal to an acute sense of justice to hear argument that Mrs. Lucky was legally prevented from hearing plaintiff's protest on the fourth day[5] after publication (Sunday included) because she was powerless to act after three days, but that she had the power to make a valid publication of plaintiff's notice ten

---

4. Cf. footnote 1, supra.

5. A case cited by appellee to support her position that she was legally prevented from hearing plaintiff's protest after the expiration of three days (without making allowance for Sunday) warns us that the rule of construction in Louisiana is thus strict: "We are admonished by article 13 of the Civil Code to adhere to the letter of the law, and not to attempt to pursue its spirit, when the law is free from ambiguity." Kelly, Weber & Co. v. F. D. Harvey & Co., 178 La. 266, 151 So. 201, 204.

or eleven days after the mailed notice when the statute required such publication "not more than five days" thereafter. If defendant relies on her lack of authority to serve plaintiff in protesting his being dropped from the voters' list because he was one day late, then he can certainly question her legal authority to make a valid publication because she was five days late.[6] We think that Mrs. Lucky's failure to comply with the statute as to the time of publishing the notice as to plaintiff made her subsequent action in striking his name from the rolls a nullity.[7]

Moreover, plaintiff categorically disputed defendant's assertion that the challenge was made in accordance with law. In order to be the basis of the drastic action in contemplation, the volunteer challengers must *sign* and *swear* to an *affidavit before* the registrar or her deputy. No other person is authorized to administer the oath for this particular purpose. Mrs. Lucky swore that the two challengers "executed an affidavit before her." Dr. Reddix swore that "the affidavit was not executed before the defendant, as alleged in her affidavit." A more clear-cut dispute would be hard to imagine. It is a dispute of a fact that stands at the heart of the case. If Dr. Reddix is right, then the entire proceedings were a nullity, because not in accord with the statute. The court did not resolve this issue. The finding of fact on this point merely stated "that the two challengers filed an affidavit with defendant  *  *" No finding is made as to whether the affidavit was made *before* the defendant or her deputy.

Mrs. Lucky did not attempt to answer that part of plaintiff's allegations that the registrar refused to process any more Negroes after May 12, other than to say that her office was open on May 14th and that "numerous individuals whose registration had been challenged appeared and their business was attended to."

Of course, these unresolved issues of fact would not be material to the case unless they related to the alleged deprivation of plaintiff's rights, and unless such deprivation was one of which the Federal courts could take cognizance. Undoubtedly they related to a deprivation of plaintiff's rights. If Reddix's complaint was true that the statute was not followed either as to the publication or as to the making of the challengers' affidavits, then he was illegally struck from the voters' list, and denied the right to vote in the mayor's election. The allegation that these prejudicial actions were done as to plaintiff and to some 2500 other Negroes for reasons of race and color, on the face of the petition made the alleged injury to plaintiff one cognizable in the Federal courts. Defendant did not assert that she had not acted on the basis of race and color, but she simply says she did not do the allegedly illegal acts at all. In one respect we have previously shown that her affidavit demonstrated that she did act illegally. As to the other, the issue is still open as to whether she acted legally in filing the two affidavits. If it should appear that, as sworn to by Reddix, she accepted void affidavits, then his charge that she did this on the grounds of race and color would of course also give rise to a Federal right.

The trial court seemed much impressed by the fact that although the Louisiana statutes make provision for *re-registration,* the appellant here has never offered himself for re-registration, although his wife has done so. In fact the trial court considered such conduct of Dr. Reddix as "bad faith  *  *  * sheer stubborn vindictiveness."

---

6. See footnote 4, supra.

7. The requirement for publishing the notice as soon as six names had accumulated was no idle requirement. It goes without saying that much of the log jam caused by hundreds of Negro voters appearing to protect their voting right would have been obviated had the notices been published earlier. Moreover, when the plaintiff failed to see his name published within five days from the original mailing, he had a right under the law to ignore the matter, since the publication within five days was a mandatory requirement of the statute.

It is clear from this abbreviated record that the occurrences during late April and early May, 1956, in which some 3,000 Negro voters and perhaps some white voters were summarily challenged within 30 days of an election under circumstances which concededly made it impossible for them all to be heard, resulting in striking some 2500 Negro voters from the rolls, was a shockingly unfair act by someone. The trial court itself stated "we are impressed that L.S.A.-R.S. 18:132 and 133 may have been misused against plaintiff, in an unfair manner, not by defendant but by Burdine and Feeback, and possibly by them or other challengers against other Negroes in Ouachita Parish." The court further stated as follows:

"This statement is based particularly upon the timing of the challenges, just prior to an election, when the books were closed for new registrations. We also are impressed with the fact that, although defendant had no alternative under the State law but to accept the challenges and proceed exactly as she did, such a large number of challenges were made that many of the persons whose registrations were challenged were unable to be served properly by defendant's staff before the legal delays expired.

"It does not lie within our province even to suggest it, but, in order to insure that this type of conduct, and the possibly unfair results which attended it, will not happen again, it seems to us that the Louisiana Legislature might amend the registration Statute so as to provide that no challenges may be made later than thirty days prior to an election; and to make challengers civilly liable in damages to voters whose registrations are challenged by them without adequate reasons. This is not to say that the Statute, as presently written, is unfair, for it is not. This is to say, however, that it can be used unfairly by challengers, as appears to have been done here."

The court thereupon allowed the plaintiff 60 days within which he should attempt to re-register, saying:

" * * * If plaintiff justifiably can and does file an amended and supplemental complaint in this action within that delay, alleging *on oath* that he has attempted to re-register as a voter in Ouachita Parish, Louisiana, and has been denied the right to do so *by defendant or her deputy,* solely on account of his race, then we will order a trial on that issue to determine the true facts, and thereafter will rule upon the record as thus presented. If plaintiff does not file such a supplemental and amended complaint within that delay, we will be entitled to assume 1) that he has succeeded in reregistering, or 2) that he has not been discriminated against solely on account of his race, or 3) that he has not attempted to reregister, and thereby has waived his claims herein. Defendant's motion for summary judgment then will be granted and the suit dismissed. There is ample precedent for this procedure being utilized in so-called civil rights cases, as a matter of comity, in order to avoid a needless clash between State and Federal authority. See Cooper v. Hutchinson, 3 Cir., 1950, 184 F.2d 119, 124; Brown v. Rutter, D.C.W.D.Ky.1956, 139 F.Supp. 679, and authorities therein cited." [148 F.Supp. 113.]

Upon the issuing of this order plaintiff notified the court that he would not amend, but desired to stand on the record as it was, but again requested that the court rule on the objection to his interrogatories. The court then entered a final summary judgment dismissing the case, once more ignoring plaintiff's request as to the interrogatories.

■ Especially in light of the injustice alleged and not disproved by affidavit, which injustice the court itself recognized to the extent of saying that it appeared that the statute had been used unfairly by the challengers and that

many of the challenged persons were unable to be served properly, we think it necessary to say that the plaintiff had the right to bring this action without starting over again to re-register. If, as he alleged, he has been illegally disqualified by the unfair action of any person whomsoever, then it is no sign of his bad faith or of a spirit of vindictiveness for him to seek to redress this wrong in court. It is no defense to an action for deprivation of the right to vote in an election to say that there are other elections coming. If the plaintiff has been illegally removed from the voters' list his remedy lies in having the illegal action rescinded, not in re-registering.

█ We think this is not a proper case for a class action. Obviously the right of each voter depends upon the actions taken with respect to his own case. As to some, it may well be that they were notified in accordance with legal requirements; as to some the affidavits may have been taken according to law; as to some they may have been adequately served in spite of the large crowds which plaintiff alleges prevented him from getting the defendant's attention. The fact that each voter must allege and prove the circumstances that might add up to an illegal purge, makes it inappropriate, if not impossible, for a single plaintiff to represent them in a class action.

We hold, therefore, that the complaint alleged a claim for which relief could be granted to plaintiff and that the case was improperly disposed of on motion for summary judgment.

The judgment is reversed and remanded for further proceedings not inconsistent with this opinion.

CAMERON, Circuit Judge (dissenting).

This is a companion case to No. 16,687, Sharp v. Lucky, 5 Cir., 252 F.2d 910, brought on the same day by the same attorney and decided on appeal by this Court at the same time. Much of the dissenting opinion I have filed in that case applies here. The two civil actions grew out of the same series of events.

In the present case, the District Court wrote an opinion analyzing the facts and quoting pertinent portions of the authorities.[1] The reasoning of that opinion is, to my mind, accurate and should be affirmed; and I dissent from the opinion of the majority in this case, based upon the opinion of the District Court, my dissent in the Sharp case, and these additional comments.

I.

(a) The only pleadings before the District Court were the complaint and the motion to dismiss which was based upon three grounds:

"(1) To dismiss this action on the ground that the court lacks jurisdiction over the subject matter.

(2) To dismiss this action on the grounds that the court lacks jurisdiction over the person.

(3) To dismiss the action because the complaint fails to state a claim against the defendant upon which relief can be granted."

In support of ground No. 3, appellee filed one affidavit and appellant countered with two affidavits. The majority opinion deals only with ground (3).

(b) Grounds (1) and (2) supra challenged the jurisdiction of the District Court, and that question was present at the threshold and remained the first order of business throughout consideration of the case. There being no diversity of citizenship or other ground of jurisdiction claimed, neither the District Court nor we have any jurisdiction of the case unless the complaint shows on its face a right to maintain the action under 28 U.S.C.A. § 1343 quoted by the majority opinion.

To state a claim under that statute a litigant is required to allege not only that state officials have treated him illegally, denying him the equal protection of its laws, but that such treatment was accorded him *because of his race or col-*

1. Reddix v. Lucky, D.C.1957, 148 F.Supp. 108 et seq.

*or.* The Constitution and the statutes relied upon by the majority all make this clear.

For example, the Fifteenth Amendment provides that the right to vote shall not be abridged by a state "on account of race, color, or previous condition of servitude." 42 U.S.C.A. § 1971, which the majority says implemented that constitutional provision, contains like words, "without distinction of race, color, or previous condition of servitude * * *."

The basic Supreme Court decision applying these principles is Snowden v. Hughes, 1943, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497. No more accurate standard for decision in this case could be enunciated than to quote the language of that case. Snowden had been certified as one of the chosen candidates of the Republican Party in a state election by the County Canvassing Board. But the State Primary Canvassing Board refused to certify him as a candidate, and he brought suit under the same statutes as are here involved. What the Supreme Court said there controls this case:[2]

"The protection extended to citizens of the United States by the privileges and immunities clause includes those rights and privileges which, under the laws and Constitution of the United States, are incident to citizenship of the United States, but does not include rights pertaining to state citizenship and derived *solely from the relationship of the citizen and his state established by state law.* In re Slaughter-House Cases, 16 Wall. 36, 74, 79, 21 L.Ed. 394; Maxwell v. Bugbee, 250 U.S. 525, 538, 40 S.Ct. 2, 5, 63 L.Ed. 1124; Prudential Insurance Co. of America v. Cheek, 259 U.S. 530, 539, 42 S.Ct. 516, 520, 66 L.Ed. 1044; Madden v. Commonwealth of Kentucky, 309 U.S. 83, 90–93, 60 S. Ct. 406, 409, 410, 84 L.Ed. 590. The right to become a candidate for state office, *like the right to vote for the election of state officers,* Minor

v. Happersett, 21 Wall. 162, 170–178, 22 L.Ed. 627; Pope v. Williams, 193 U.S. 621, 632, 24 S.Ct. 573, 575, 48 L.Ed. 817; Breedlove v. Suttles, 302 U.S. 277, 283, 58 S.Ct. 205, 208, 82 L.Ed. 252, *is a right or privilege of state citizenship, not of national citizenship which alone is protected by the privileges and immunities clause.* * * *

"* * * The denial alleged is of the right of petitioner to be a candidate for and to be elected to public office upon receiving a sufficient number of votes. The right is one secured to him by state statute and the deprivation of the right is alleged to result solely from the Board's *failure to obey state law.* * * * *There is no allegation of any facts* tending to show that in refusing to certify petitioner as a nominee, the Board was making any *intentional or purposeful discrimination between persons or classes.* * * *

"* * * *The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.* * * * But a discriminatory purpose is not presumed, * * * *there must be a showing of 'clear and intentional discrimination,'* * * * But a mere showing that negroes were not included in a particular jury is not enough; *there must be a showing of actual discrimination because of race.* * * *

"The lack of any allegations in the complaint here, tending to show a purposeful discrimination between persons or classes of persons is not supplied by the opprobrious epithets 'willful' and 'malicious' applied to the Board's failure to certify peti-

---

**2.** The quotation brings together separated sentences from the decision appearing on

pages 6–12 of 321 U.S., at page 400 of 64 S.Ct.

tioner as a successful candidate, or by characterizing that failure as an unequal, unjust, and oppressive administration of the laws of Illinois.

*  *  *  *Such allegations are insufficient under our decisions to raise any issue* of equal protection of the laws or to call upon a *federal court to try questions of state law* in order to discover a purposeful discrimination in the administration of the laws of Illinois which is not alleged. *  *  *

"A construction of the equal protection clause which would find a violation of federal right in every departure by state officers from state law is not to be favored.  *  *  *" [Emphasis supplied.]

Against that clear and unequivocal statement of the law the averments of the complaint ought to be laid. Since most of appellant's brief consists of quoting from the complaint, we copy in the margin the portions of the complaint which the brief sets out in full, with the thought that it would be highly illogical not to assume that therein appellant has put his best foot forward.[3] We have underscored the only allegation of the complaint copied in the brief which charges that the action taken was solely on the basis of race—"that the challenge was conducted wholly and solely on the basis

3. Paragraph eight of the complaint reads as follows: *"That the challenge was conducted wholly and solely on the basis of race and that if any white persons were challenged they were so few that the number would be of no consequence;* that the defendant mailed more challenges than her office could accommodate and hundreds of Negroes never got into her office to answer the challenge; that the only investigation made of the Negroes status was a brief look at their registration card and therefore the investigation required by Louisiana Revised Statutes of 1950, Title 18, section 133 was never complied with; that proper publication and notice in the newspaper and necessary delay was not allowed as provided by Louisiana Revised Statutes of 1950, Title 18, section 132; that hundreds of letters challenging the right of Negroes to remain on the rolls were never delivered and were returned to the office of the registrar even though they were correctly addressed; that hundreds of Negroes were denied certification by the registrar and/or her deputy on the basis they would have to produce three (3) *bona fide* registered voters from their precinct all in violation of Louisiana Revised Statutes of 1950, Title 18, section 132; that hundreds of Negroes were denied certification or the right to prove their right to remain on the rolls because their time had expired as provided by section 132 above quoted even though they had stood in line several days and could not get near the office because of the number of persons trying to answer their challenge; that the registrar closed her office on May 12, 1956 and refused to process any more Negroes even though hundreds stood around the office and continued to come back for the purpose of protecting their right to remain on the rolls; that for the several reasons in this paragraph stated plaintiff and twenty-five hundred (2500) other Negroes were disqualified to remain on the roll of registered voters by defendant."

Paragraph nine of the complaint reads as follows: "That the office of the registrar closed on May 12, 1956 and that the last publication of names challenged appeared in the May 11, 1956 issue of the Monroe News Star, a clipping of said names being attached hereto and made a part of this petition and marked 'exhibit A' for purpose of identification; that plaintiff brings this action in his own behalf and that of the three thousand (3,000) other Negroes so challenged and *particularly on behalf of all persons named in exhibit 'A' attached hereto.'*"

Paragraph ten of the complaint reads as follows: "That plaintiff in particular went to the office of defendant on May 15, 1956 at 10:30 A.M. and offered to answer the challenge but was refused by defendant on the basis that the books were closed; that because of the number of persons around her office daily trying to prove the correctness of their registration plaintiff could not get in the office before the above mentioned date even though he tried many times."

Paragraph eleven of the complaint reads as follows: "That there was no reason to believe that plaintiff was illegally registered and he has been damaged by the aforesaid acts of defendant to the extent of Twenty-Five Thousand and No/100 ($25,000.00) Dollars."

of race. * * *" The complaint does not charge that appellee had any part in the challenging of appellant or any of the other Negroes mentioned; it is not even charged that she conspired with the challengers or acted in concert with them.[4] The second specification of errors in appellant's brief is that the District Court erred "in holding the registrar was required to accept the affidavit of Burdine and Feeback and legally could not have refused to accept it." We repeat that the complaint and the argument of appellant do not intimate that appellee had anything to do with the challenge of these Negroes and whites.

(c) The majority seems content to act upon the thesis that jurisdiction was conferred and a federal action stated by appellant based on "her [i.e. appellee's] own illegal failure to comply with the state law respecting the processing of such a challenge." Following the quoted words, the majority opinion proceeds to point out several particulars in which appellee failed to comply with state law: by failing to make proper publication and notice in the newspaper, by closing her office on May 12th, by refusing to process any more Negroes than she did even though hundreds stood around the office, and by striking the names of the Negroes from the voters' roll. In no instance were any facts set forth sustaining the charge that these failures to comply with state law were practiced because plaintiff was a Negro, or that the same failures did not produce identical results with respect to white voters as well.

(d) This Court has consistently held that, where the effort is made to invoke the jurisdiction of a federal court under the civil rights statutes, it will assiduously strip the complaint of all mere conclusions and of allegations not factually supported.

Here is the language of McGuire v. Todd, 5 Cir., 1952, 198 F.2d 60, 63, certiorari denied 344 U.S. 835, 73 S.Ct. 44, 97 L.Ed. 649:

"* * * as other courts have done, we disregard, as mere conclusions, the loose and general, the *factually unsupported,* characterizations of the complained of acts of the defendants, as malicious, conspiratorial, and *done for the purpose of depriving plaintiffs of their constitutional rights;* that the things defendants are alleged to have done, as distinguished from the conclusions of the pleaders with respect to them, do not constitute a deprivation of the civil rights of the plaintiffs, do not give rise to the cause of action claimed * * *." [Emphasis added.]

(e) The general statement quoted in the majority opinion that "she has abridged his privileges and immunities as a citizen of the United States and has denied him equal protection of the law * * * and is presently denying him and the class he represent [sic] the above enumerated rights all because they are members of the Negro race * * *" is so palpably a conclusion and a "loose and general * * * and factually unsupported characterization" that appellant did not even include it in the portion of the complaint copied in his brief. Every one of the cases enumerated in Footnote 4 *supra* contained almost identical generalizations, but this Court would not accept them because they were factually unsupported.

Such is certainly the case here. Everything appellee did which is alleged to have been in violation of state law affected whites and Negroes alike. The complaint not only fails to show anything appellee did against the Negroes which

4. A charge that has been made in bold language but rejected by us in the cases enumerated in this note because the effort to connect state officials with private citizens was set forth in the *conclusions of the pleader without recital of the facts upon which the conclusions were based:* Charlton v. City of Hia-leah, 5 Cir., 1951, 188 F.2d 421; Hewitt v. City of Jacksonville, 5 Cir., 1951, 188 F.2d 423; Whittington v. Johnston, 5 Cir., 1953, 201 F.2d 810; Yglesias v. Gulfstream Park Racing Association, 5 Cir., 1953, 201 F.2d 817; Dinwiddie v. Brown, 5 Cir., 1956, 230 F.2d 465, and Roark v. West, 5 Cir., 251 F.2d 956.

did not equally affect the whites, but the complaint affirmatively implies that some white people were prejudiced by appellee's alleged illegal actions.

(f)  It is important to keep in mind that the conduct of elections is a state matter regulated by state laws and conducted by state officials. The first time the Supreme Court had before it the statutory implementation of the Fourteenth Amendment [5] as applied to voting rights, it used this language:

"The amendment did not add to the privileges and immunities of a citizen. It simply furnished an additional guaranty for the protection of such as he already had. No new voters were necessarily made by it. * * * It is clear, therefore, we think, that the Constitution has not added the right of suffrage to the privileges and immunities of citizenship as they existed at the time it was adopted."

At the following term of court, when called upon to deal with the Fifteenth Amendment, the Court, speaking again through Chief Justice Waite,[6] used like language:

"The Fifteenth Amendment does not confer the right of suffrage on anyone. It prevents the States, or the United States, however, from giving reference, in this particular, to one citizen of the United States over another on account of race, color, or previous condition of servitude."

And in Terry v. Adams, 1953, 345 U. S. 461, 467, footnote 2, 73 S.Ct. 809, 812, 97 L.Ed. 1152, the same idea was repeated:

"It appears that the right of suffrage is not a necessary attribute of national citizenship; but that exemption from discrimination in the exercise of that right on account of race, etc., is. The right to vote in the States comes from the States; but the right of exemption from prohibited discrimination comes from the United States."[7]

(g)  Judged against the background of the standards set up and consistently followed by this Court, it is my opinion that the complaint was properly dismissed under grounds (1) and (2) *supra* for failure to allege facts showing federal jurisdiction.

II.

In my opinion the District Court was also correct in holding that the relevant and material facts were undisputed, in testing the third ground of the motion to dismiss, failure to state a claim. The affidavits are to be subjected to the same tests as the pleadings. A large part of the majority opinion is devoted to a discussion of what it conceives to be questions of fact raised by the affidavits. The majority quotes Mrs. Lucky's affidavits that "two bona fide registered voters of Ouachita Parish, Louisiana executed an affidavit before her challenging the registration of Dr. J. I. Reddix;" and Dr. Reddix' response: "Said challenge was not made in compliance with the law on the subject and that affidavit *was not executed before the defendant as alleged in her affidavit* even though the same appears to have been signed by John J.

---

5.  Minor v. Happersett, 1874, 21 Wall. 162, 171, 88 U.S. 162, 171, 22 L.Ed. 627, construing the statute which is now 42 U.S. C.A. § 1983, being the statute most relied upon by appellant here.

6.  United States v. Reese, 1875, 92 U.S. 214, 217, 23 L.Ed. 563.

7.  See also United States v. Cruikshank, 1875, 92 U.S. 542, 555, 23 L.Ed. 588; United States v. Harris, 1882, 106 U.S. 629, 637, 1 S.Ct. 601, 27 L.Ed. 290; Logan v. United States, 1891, 144 U.S. 263, 286, 12 S.Ct. 617, 36 L.Ed. 429; McPherson v. Blacker, 1892, 146 U.S. 1, 38, 13 S.Ct. 3, 36 L.Ed. 869; and James v. Bowman, 1902, 190 U.S. 127, 138, 23 S.Ct. 678, 47 L.Ed. 979, and cf. Snowden v. Hughes, 1943, 321 U.S. 1, 7, 64 S. Ct. 397, 88 L.Ed. 497.

The cases dealing with the right to vote for federal office holders provided in the body of the Constitution itself have no application here.

Feeback and Wesley Burdine." [Emphasis not supplied.] There is no dispute here of the crucial fact that the two registered voters did execute an affidavit challenging Dr. Reddix' registration. What dispute these quotations reflect concerns an immaterial matter. If appellee acted on an insufficient affidavit, she merely failed to perform duties imposed upon her by a valid state statute.[8]

The majority opinion then proceeds to enumerate inconsistencies between the two affidavits relating to such matters as whether the original challenge was immediately mailed to Dr. Reddix, whether publication was timely made, whether Negroes were "processed" after May 12th, and one or two other similar alleged inconsistencies. All of them, assuming that the affidavits do in fact conflict, relate to whether appellee performed the duties *laid upon her by state statute*. As stated, such failure, unless practiced against appellant because of his race, would not sustain a civil rights suit, and the conflict, if such there was, related to immaterial matters.

The majority opinion devotes several paragraphs to discussing whether the publication made by appellee was within the time prescribed by state statute. I am not able to follow this portion of the opinion. Even if it were material, I think that we ought to give great weight to the District Court's finding that the Louisiana law was tracked. This is in line with the practice universally approved by the Supreme Court.[9]

---

**8.** It is appropriate to pause to say that there is no conflict between these two statements which is of such a nature as a court could accept as such. The affidavit of Dr. Reddix was required to be made upon his own personal knowledge. He could not possibly have known, especially under all of the facts sought to be set forth in his affidavit, when and before whom the affidavit was made. I quote from an opinion of this Court filed in the past few days, Alger v. United States, 5 Cir., 252 F.2d 519, 521: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein [quotation is from Rule 56(e) F.R.C.P.]. * * * The inadequacies of this affidavit under the standard established by Rule 56(e) are too glaring to require much discussion." An examination of the inadequacies there dealt with will show that they are not as glaring as those here involved.

To charge that appellee stated a deliberate untruth when she swore that the affidavit was made before her is to charge fraud of the worst sort. A charge of fraud, whether in a pleading or in evidence, must be established by evidence which is clear, positive and convincing. 37 C.J.S. Fraud § 114, p. 427 et seq. And see Prevost v. Gratz, 6 Wheat. 481, 498, 5 L.Ed. 311; United States v. City of Brookhaven, 5 Cir., 1943, 134 F.2d 442, 445, and Saenz v. Kenedy, 5 Cir., 1949, 178 F.2d 417, 419.

**9.** No better statement of it has been found than that made by Mr. Justice Brandeis, dissenting in Railroad Commission of California v. Los Angeles Railway Corp., 1929, 280 U.S. 145, 164, 50 S.Ct. 71, 76, 74 L.Ed. 234, where he enumerates a number of cases so holding: "It is a serious task for us to construe and apply the written law of California. * * To 'one brought up within it, varying emphasis, tacit assumptions, unwritten practices, a thousand influences gained only from life, may give to the different parts wholly new values that logic and grammar never could have gotten from the books.' Diaz v. Gonzalez, 261 U.S. 102, 106, 43 S.Ct. 286, 288, 67 L.Ed. 550. This court is not peculiarly fitted for that work. We may properly postpone the irksome burden of examining the many relevant state statutes and decisions until we shall have had the aid which would be afforded by a thorough consideration of them by the judges of the District Court, who are presumably more familiar with the law of California than we are."

The same principle of deference to the findings and conclusions of judges steeped in the law of a state has been announced in: Thompson v. Consolidated Gas Co., 1936, 300 U.S. 55, 74–75, 57 S.Ct. 364, 81 L.Ed. 510; Huddleston v. Dwyer, 1944, 322 U.S. 232, 237, 64 S.Ct. 1015, 88 L.Ed. 1246; Gardner v. State of New Jersey, 1946, 329 U.S. 565, 583, 67 S.Ct. 467, 91 L.Ed. 504, and General Box Co. v. United States, 1956, 351 U.S. 159, 165, 76 S.Ct. 728, 100 L.Ed. 1055.

## III.

The majority opinion discusses at some length the failure of the court below to require appellee to answer certain interrogatories addressed to her by appellant under Rule 33 F.R.C.P. It is plain that the parties went to trial without asking any delay or making any point about this action of the court.[10] The fact is that the interrogatories related to matters which would be fully disclosed by an examination of the books, and the books were proffered to appellant in open court during the trial. Moreover, appellant filed two affidavits which presented ex parte the chief items of evidence to which the interrogatories related. Finally, it would be a very rare case where an appellate court would find that the trial court had abused its discretion in such routine matters as rulings on a party's efforts at discovery. 4 Moore's Federal Practice, Par. 33.27, pp. 2339–2340.

## IV.

The majority expresses its stern disapproval of the whole episode described in the complaint and adverts to the fact that the District Court had been similarly outraged by it. But that is not the question involved. The question is one of jurisdiction whether appellant should vindicate his rights in a federal court or in a state court.[11] Implicit in the vigorous language and the holding of the majority opinion is the thought that federal courts are wavering in their traditional attitude of abstention from intervening in matters properly within state competence, whether actual proceedings have been begun or not.[12]

Such an assumption is, in my opinion, wholly unjustified. Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138, was also an action under the statute here involved. That was an effort to procure from the federal court an injunction against the use in state proceedings of certain admittedly unconstitutionally obtained evidence. Citing Screws v. United States, 325 U.S. 91, 108, 65 S.Ct. 1031, 89 L.Ed. 1495; Collins v. Hardyman, 341 U.S. 651, 658, 71 S.Ct. 937, 95 L.Ed. 1253; Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324, and other cases, the Supreme Court used this language:[13]

"For even if the power to grant the relief here sought may fairly and constitutionally be derived from the generality of language of the Civil Rights Act, to sustain the claim would *disregard the power of courts of equity to exercise discretion* when, in a matter of equity jurisdiction, the balance is *against the wisdom of using that power.* * * *

Browder v. City of Montgomery, D.C. Ala. 1956, 146 F.Supp. 127.

10. The Supreme Court has recently frowned upon the practice followed by some appellate courts of basing their decisions upon points not urged before the lower court, Barr v. Matteo, 355 U.S. 171, 78 S.Ct. 204, 2 L.Ed.2d 179.

11. From unchallenged statement in the argument before us, we have learned that nine persons have suffered the penalty of the law in the state courts for their parts in the proceedings forming the subject matter of this complaint. We were advised also that more than one thousand white people had lost their right to vote; and the majority opinion recognizes that "perhaps some white voters" suffered the same privations as the Negroes. Of the former, the District Court was advised by Judicial Notice,

12. And cf. the statement in Morrison v. Davis, 5 Cir., 252 F.2d 102, 103: "Whatever may be the rule as to other threatened prosecutions, the Supreme Court in a case presenting an identical factual issue affirmed the judgment of the trial court in the Browder case in which the same contention was advanced. To the extent that this is inconsistent with Douglas v. City of Jeannette, Pa., 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324, we must consider the earlier case modified."

13. The quotation is taken from pages 120, 121 and 122 of 342 U.S., pages 120 and 121 of 72 S.Ct.

"*  *  * Regardless of differences in particular cases, however, the Court's lodestar of adjudication has been that the statute 'should be construed so as to respect the proper balance between the States and the federal government in law enforcement.' * * *

" '*  *  * Hence, courts of equity in the exercise of their discretionary powers should conform to this policy by refusing to *interfere with or embarrass threatened proceedings in state courts* save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent; * * *.' " [14]   [Emphasis added.]

And this Court has steadfastly accorded to District Courts the discretion to refuse to take hold of a case under the Civil Rights Acts unless the compulsion towards such action was strong indeed. See Brown v. Board of Trustees of LaGrange Independent School District, 5 Cir., 187 F.2d 20, where we held that a court of equity had the discretion to dismiss a suit because the court was not equipped to operate a school system. And see also Illinois Central R. Co. v. Bullock, 5 Cir., 181 F.2d 851. While, therefore, I feel that the court below was correct in the reasoning of its opinion and the conclusion reached, and also that the complaint failed to state a case of which the federal court had jurisdiction, it seems to me too plain for argument that the court had the *discretion* to dismiss appellant's action, and that we should not hold that its discretion was abused.

Rehearing denied: CAMERON, Circuit Judge, dissenting.

14. To the same effect are Railroad Commission of Texas v. Pullman Co., 1941, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L. Ed. 971; City of Chicago v. Fieldcrest Dairies, Inc., 1942, 316 U.S. 168, 62 S. Ct. 986, 86 L.Ed. 1355; A. F. of L. v. Watson, 1946, 327 U.S. 582, 595–599, 66 S.Ct. 761, 90 L.Ed. 873, and Amalgamated Clothing Workers of America v. Richman Bros., 1955, 348 U.S. 511, 514–515, 75 S.Ct. 452, 99 L.Ed. 600.